No. 64.—Padelford, Fay & Co. plaintiffs in error *vs.* The Mayor and Aldermen of the City of Savannah.

[1.] The Ordinance of the City Council of Savannah, "That on the gross amount of sales of all negroes, goods, wares and merchandise or other commodity, article or thing sold within the corporate limits of the city of Savannah, by any person or persons whomsoever, upon or for a commission, premium, per centage or other profit charged or to be charged thereon, or on joint account, and when not included in the returns as stock in trade, and whether for cash or credit, between the twenty-fourth day of January, 1842, and the last of April, 1842, inclusive, and annually thereafter, between the first day of May in each and every year, and the last day of April in each succeeding year, inclusive, there shall be paid by the person so sell-

ing, whether commission merchant, broker or agent of any nature or kind whatsoever, fifty cents on every hundred dollars of the amount of such sales, respectively", &c., is not unconstitutional, according to the decision of the Supreme Court of the U. S. in *Brown vs. Maryland*, 12 *Wheat.*

[2.] That case is overruled by the *License Cases*, in 5 *Howard's R.*

[3.] And by the *Passenger Cases*, in 7 *Howard's R.*

[4.] And partly by the case of *Groves et al. vs. Slaughter*, 15 *Pet.*

[5.] The Constitution is to be construed in the sense in which it was understood by the makers of it at the time when they made it.

[6.] This sense is expressed by the four following propositions:

1. That the Constitution delegated to the General Government, or any department thereof, no power by *implication*, but only delegated such powers as it *expressly enumerated.*

2. That it delegated no exclusive power, unless the delegation was *said* to be exclusive.

3. That it laid no prohibition upon the States, except such as it specified.

4. That the words used in it, if susceptible of more meanings than one, were used in the meaning which was least favorable to the delegation of power, and most favorable to its retention.

[7.] The Supreme Court of Georgia is co-equal and co-ordinate with the Supreme Court of the U. S.; and therefore, the latter cannot give the former an order, or make for it a precedent.

[8.] The four propositions are true, anything said or done by the Supreme Court of the U. S. to the contrary, notwithstanding.

[9.] Tried by these, the decision in *Brown vs. Maryland*, is unconstitutional.

[10.] Tried by these, the Ordinance in question is not unconstitutional, as against the commercial clause.

[11.] Tried by these, it is not against the clause which prohibits the State to tax imports.

[12.] The meaning of this clause is—

1. That without the consent of Congress, a State may tax imports for the purpose of executing her Inspection Laws.

2. That the net produce of such a tax is for the U. S.

3. That with the consent of Congress a State may tax imports for any purpose.

4. That even without the consent of Congress, a State may tax imports for any purpose, subject only to a power in Congress to 'revise' and 'control' the Tax Law.

5. That the part of the clause giving the 'net produce' to the U. S. applies only to Tax Laws for inspection purposes.

[13.] Whether the Court is not bound to presume that this Ordinance was passed for executing an Inspection Law, may admit of a doubt.

[14.] Admitting it not to have been for inspection purposes, yet it is to be presumed that Congress has consented to it.

[15.] But if Congress has not consented to it, still it is not void, but only subject to be revised and controlled by Congress.

[16.] If void, it works no wrong to these plaintiffs.

Certiorari in Chatham.    Application refused by Judge FLEMING, at Chambers, Dec. 21st, 1853.

The City Council of the City of Savannah, passed the following Ordinance: "*And be it farther ordained*, that on the gross amount of sales of all negroes, goods, wares and merchandize, or other commodity, article or thing, sold within the corporate limits of the City of Savannah, by any person or persons whomsoever, upon or for a commission, premium, per centage or other profit, charged or to be charged thereon, or on joint account, and when not included in the returns as stock in trade, and whether for cash or credit, between 24th January, 1842, and the last of April, 1842, and annually thereafter, between 1st May in each and every year, and the last day of April in each succeeding year, inclusive, there shall be paid by the person so selling, whether commission merchant, trader or agent, of any nature or kind whatever, fifty cents on every hundred dollars of the amount of such sales respectively".

Padelford, Fay & Co. commission merchants, refused to pay the tax upon goods and merchandize imported into this State, and sold by them in the original casks and packages, upon commission, upon the ground that the laying of this tax was a violation of the Constitution of the United States.    Upon certiorari before Judge *Fleming*, this objection was overruled, and this decision is assigned as error.

LAW & BARTOW, for plaintiff in error.

GRIFFIN, for defendant in error.

*By the Court.*—BENNING, J., delivering the opinion.

But a single question is presented for decision in this case;

and that is, whether the Ordinance of the City Council of Savannah violates the Constitution of the United States.

The plaintiffs in error insist that it violates two of the provisions of the Constitution—that which declares that Congress shall have power " To regulate commerce with foreign nations and among the several States" ; and that which declares that " No State shall, without the consent of the Congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its Inspection Laws".

The question is one of the utmost importance.    The State has passed many unconstitutional Tax Laws, if this be unconstitutional.    The great Tax Act of 1804, declared that " Thirty-one and a quarter cents shall be levied on every hundred dollars' value of all person's *stock in trade*".

Also, "That any *non-resident* who shall expose to sale any goods in this State, shall, on his arrival, or within seven days ' after entering the same, make return," &c.

The Act of 1821 declares that there shall be paid to the State " A tax of thirty-one and a quarter cents on every hundred dollars' value of stock operated upon by the Steamboat Company of Georgia".

The Act of 1840 declares that the tax " On capital employed in the business of Brokerage, and capital employed by Insurance and Trust Companies, in this State, shall be the thirty-one and a quarter cents on every hundred dollars so invested".

The Act of 1845 lays " On all agencies of Banks authorized by *other States*, and kept within this State, a tax of eight cents on every hundred dollars, on the amount of exchange bought and sold".

The Act of 1850 imposes a tax on " Each and every agent of any foreign Bank or individual residing in another State, doing business in this State".

The same principle that will make the Ordinance of the City Council unconstitutional, will equally make these acts so.    Indeed, if the Ordinance violates the provision in the Constitution, as to the regulation of commerce, it is not very easy to see what is left to a State to tax.    It can lay no tax that will

not more or less affect commerce ; more or less prevent consumption, and without consumption there can be no commerce.

The question, then, deserves the most serious consideration.

The question, it is insisted by counsel for plaintiff, has been settled in their favor by the decision of the Supreme Court of the U. S. in the case of *Brown et al. vs. Maryland,* 12 *Wheat.* 419. That case, therefore, will be noticed.

The case grew out of an Act of Maryland, " That all importers of foreign articles or commodities of dry goods, wares or merchandize, by bail or package, or of wine, rum, brandy, whiskey and other distilled spirituous liquors, &c. and other persons selling the same by wholesale, bale or package, &c. should, before they were authorized to sell, take out a license, for which they should pay fifty dollars.

The plaintiffs in the case " Imported and sold one package of foreign dry goods, without having license to do so."

The Supreme Court determined that this Act was a breach of each of the two clauses of the Constitution which I have quoted.

In relation to its being a violation of the clause which prohibits the States from laying any tax on imports or exports, without the consent of Congress, the Court, through *Marshall,* *C. J.* say, " It may be conceded, that the words of the prohibition ought not to be pressed to their utmost extent". " But while we admit that sound principles of construction ought to restrain all Courts from carrying the words of the prohibition beyond the object the Constitution is intended to secure, that there must be a point of time when the prohibition ceases, and the power of the State to tax commences ; we cannot admit that this point of time is the instant that the articles enter the country." " It is sufficient for the present to say, generally, that when the importer has so acted upon the thing imported, that it has become incorporated and mixed up with the mass of property in the country, it has perhaps lost its distinctive character as an import." " This indictment is against the importer, for selling a package of dry goods in the form in which it was imported, without a license. This state of things is changed,

if he sells them or otherwise mixes them with the general property of the State, by breaking up his packages and travelling with them as an itinerant pedlar."

The amount of this is, that although the mere introduction of an import into a State does not make it cease to be an import, yet, if the importer so act upon it as to make it become incorporated and mixed up with the mass of property in the country, as by selling it or breaking up the package in which it is contained, it does then cease to be an import; and that as soon as it ceases to be an import, it may be taxed by the State.

Is this case analagous to the one we are deciding? It is not. It was a case in which the Law prohibited the importer from selling the import. This is a case in which the Law lets him sell the import, but lays a tax on what he gets for it, on the gross amount of money which he receives for it. Now this money, it is, which is taxed. And *it* is something which "Had been incorporated and mixed up with the mass of property in the country." Something as different from "A package of dry goods, in the form in which it was imported", as that package, when sold, would be different from itself, in the form in which it was imported, or as that package, when broken up, would be different from itself, before its being broken up.

According to the principles, then, of *Brown vs. Maryland*, the State *can*, rather than *cannot*, tax this something—this money—the proceeds of the sale of the imports.

Again, the gross amount of sales are not the exact equivalents to the seller of the things sold. This amount is made of the cost of the goods sold and of the seller's profits, on them. Where do these profits come from? They, at least, are not imports. A tax on the gross amount of sales, is a tax, in part, on these profits.

And all of the expenses to which the importer is put, after his import gets into the country, to bring it to sale, also enter into the gross amount of sales. His agents, his store-houses, his insurers, all cost him money. This cost he puts in the price of the import when he sells it. Now cannot the State lay a tax on these profits—these services of agents—these storages—

these insurances? A tax on the gross amount of sales is a tax, in part, on these things. But a tax on the naked import, is not a tax on any of them. I say in part; but would not a Court be justified, in order to save its State from the imputation of having violated the Constitution, to presume that the whole tax was intended to be on this part—the part of the "gross amount of sales," due to these several items, and that the whole gross amount of sales was adopted merely as a convenient measure of the tax. Be this as it may, there is certainly a marked difference between "imports" and the "gross amount of the sales" of imports.

But the Ordinance is not confined to the gross amount of the sales of *imports*. Imports are not mentioned in it. It is a general Tax Law. It lays a tax on the gross amount of sales of all negroes, goods, wares and merchandize, or other commodity, article or thing sold within the corporate limits of Savannah, by any person, upon a commission, &c. "Between the first day of May in each and every year, and the last day of April in each succeeding year", &c.

The tax is upon the gross amount of the sales arising from a whole year's business, and dealing in articles of whatever kind.

This shows the *intention* to have been to put articles of import, to say the least, upon no worse footing than domestic products. And it is not said, in *Brown vs. Maryland,* that the State must discriminate *in favor* of the foreigner, and not tax him when she taxes her own citizens. But it is said, in that case, "That in our complex system, the *object* of the powers conferred on the government of the Union, and the *nature* of the often conflicting powers which remain in the States, must *always* be taken into view, and may aid in expounding the words of any particular clause". Now, what was the object of this prohibition? In a word, was the object to put *foreigners* in a better condition than natives? We know the object was not to put citizens of other States in that better condition, for as to this, the Constitution, in another clause, says—" The citizens of each State shall be entitled to all privileges and immunities of citizens in the several States". They shall be equal

to citizens not better off than citizens. If, then, the object was not to put foreigners in a better condition than natives, the object was not to prohibit such an Ordinance as this, for it merely puts them upon the same footing as that of citizens. But, indeed, the great object of this clause, as the history of it shows, and to which I may hereafter refer, was to prevent the seaboard States from taxing the imports of the interior States, as those imports passed through the former States to the latter. To do this effectually, *discriminating* taxes have to be laid upon such imports. But this is not a discriminating tax.

According, then, to the principles laid down in *Brown vs. Maryland,* this Ordinance is *not* a violation of the clause of the Constitution which prohibits the States to tax imports.

Is it, according to those principles, a violation of the power delegated to Congress, "To regulate commerce with foreign nations and among the States?" It is not. Those principles apply equally to both clauses of the Constitution. If the "gross amount of sales" is not an import, or not imports, it is not any thing which belongs to foreign or interstate commerce, and therefore, not any thing falling under the power to regulate such commerce.

[1.] According, then, to the principles laid down in *Brown vs. Maryland,* this Ordinance is not unconstitutional. This is the opinion of every member of this Court. But speaking for myself, I am not willing to let the decision rest on this ground alone. I do not wish to be considered, by implication, as admitting that I think the decision in *Brown vs. Maryland* to be right, or as admitting that I think a decision of the Supreme Court of the U. S. is a binding precedent for this Court. And I prefer, too, to put the decision upon the Constitution itself, as I understand the Constitution, rather than upon any decision. I shall, therefore, consider the case further.

In my opinion, the following propositions are true:

1. The decision in *Brown vs. Maryland,* has been overruled by the Supreme Court of the U. S. itself.

2. The Constitution is to be construed in the sense in which

it was understood by the makers of it at the time when they made it.

3. According to this sense, the Supreme Court of the U. S. has no appellate or other jurisdiction over this Court, and cannot, therefore, make a precedent for it.

4. According to this sense, *Brown vs. Maryland*, ought to be overruled, if it has not been.

5. And according to this sense, the decision of the Court below, in this case, ought to be affirmed.

These are propositions of some import. I shall, therefore, hold myself excused, if I go somewhat at large, into the proofs by which I think they are established. I, alone, am responsible for them, and for all that may be said in their support. What the other members of the Court may think of them, or of anything I may say in their support, I know not.

1. Has *Brown vs. Maryland* been overruled? It has, by several decisions of the Supreme Court; and first, by the decisions in the License Cases. There were three of those cases, one from New Hampshire, one from Massachusetts, and one from Rhode Island.

The facts in the N. Hampshire case were these: N. Hampshire by law, forbade "Any person, without a license, to sell wine, rum, gin, brandy, or other spirits, *in any quantity*".— Certain persons of the name of Pierce, bought a *barrel* of gin in Boston, brought it coastwise into N. Hampshire, and in N. Hampshire sold it. For this they were indicted under the aforesaid law, and were found guilty, notwithstanding their insisting that the law violated these same two provisions of the Constitution. They took their case up to the Supreme Court of the U. S.; and it affirmed the decision of the Court in N. Hampshire. (5 *How.* 554.)

Now this case is similar to that of *Brown vs. Maryland*, in every material respect, except that the article sold in it, was not an import from a foreign nation, but from a neighboring State. But the decision in *Brown vs. Maryland*, was declared to be equally applicable to the case of importations from a sister State. (12 *Wheat.* 449.)

To the extent, then, of 'commerce' and 'imports' '*among the States*', this decision overrules *Brown vs. Maryland.*— This, indeed, was admitted by the counsel for plaintiffs in error, in the case now under consideration.

The Massachusetts case grew out of a Law of that State, which forbade the sale of liquors in less quantity than twenty-eight gallons, without a license. One Thurlows sold liquor in less quantities than twenty-eight gallons; and some of it so sold, was of foreign product. The Court in Massachusetts first, and then the Supreme Court of the U. S., held the Law to be no violation of the Constitution.

In the last Court, the case was argued by Webster, Choate and Hallet, for the retailer; and in the argument, we have Mr. Webster's and Mr. Choate's exposition of *Brown vs. Maryland*. They rested their argument *exclusively* upon that case. They say the effect of the law was such, that in the county of the plaintiff's residence, containing 100,000 inhabitants, no license had been granted for six years.

And as to what *Brown vs. Maryland* decides, this is what they say:

"What is the extent of the effect of an Act of Congress? Regarded as a license to, or contract with the importer, communicating a right to sell, according to the views in *Brown vs. Maryland*, 447, what is its extent? The plaintiff contends that it would be repugnant to, and in fraud of the license, either to ordain that no one shall buy of the importer; or to ordain that no one having bought, shall re-sell: because either prohibition would totally defeat the license itself. The license is a license to carry the article to market; to trade in it; to have access with it to the consuming capacity of the country.

"The ground on which Congress legislate, in passing such an Act, and the just expectations and reasonings of the importer, prove this.

"The interception of the article, in the hands of the first buyer, on its way to a market, excludes it from market, and shuts the importer from the country as really as if he were prohibited to sell."

This is the view of Webster and Choate, as to *Brown vs. Maryland.*   And is it possible to doubt its correctness ?— " The license (the Act of Congress) is a license to carry the article to a market, to trade in it, to have access with it to the *consuming* capacity of the country" ; that is, to be allowed to sell by *retail.*   Without retail, there can be no *consumption* worth talking about.   (5 *How.* 505, 513.)

*The decision in Brown vs. Maryland* says, that the States cannot prohibit the sale of imports by wholesale.   The *reason* of the decision equally says, that they cannot prohibit the sale of imports by retail.

Now the decision in this Massachusetts License Case says, that the States may prohibit the sale of imports, by retail— the reason of the decision equally says, they may prohibit their sale by wholesale.   This reason is, that the States have power *to stop the consumption* of the article.   And this may be done as effectually by a prohibition of one sort of sale, as by a prohibition of the other.   The reason, then, on which the decision in *Brown vs. Maryland* is made to stand, is repudiated by this decision ; and when the reason of a decision is repudiated, the decision itself is overruled.   It is true, perhaps, that this ought to be said at the time when the reason is repudiated ; otherwise, the ghost of the overruled case may frighten the timid or mislead the weak.

The Rhode Island Case was not unlike the Massachusetts Case.

These cases not only overrule the case of *Brown vs. Maryland* ; but they establish just the opposite principle to the one which it established.   They establish the principle that an article from abroad ceases to be an import—ceases to be an article of foreign commerce, the instant it enters, with the permission of the government of the home territory.   And if it is ever to cease to be an import at all—ever to lose its foreign attributes and become *naturalized,* is not this the point of time at which the change must take place ?   The article undergoes no farther transformations, except such as domestic articles undergo.   Why, then, should the time when the change

is to take place, be put off until the article comes to second or third hands; or until it comes to the consumer; or until it is broken up into fragments. No reason appears for such postponement. If postponed, the selection may as well be of one of the points of time as of another. There is nothing in *them* to justify a preference of one to another. Not only so, but nothing is gained to the importer or to anybody, by any such postponement.

And this is the ground upon which the opinion of one of the Judges is frankly put—Mr. Justice Daniel. He says: "Imports in a political or fiscal, as well as in common practical acceptation, are properly commodities brought in from abroad, which either have not reached their perfect investiture or their ultimate destination, as property within the jurisdiction of the State; or which still are subject to the power of the Government, for a fulfilment of the conditions upon which they have been admitted to entrance: as for instance, goods on which duties are still unpaid, or which are bonded, or in public ware-houses. So soon as they are cleared of all control of the Government which permits their introduction, and have become the complete and exclusive property of the citizen or resident, they are no longer imports in a political, or fiscal, or common sense."

It follows from this notion of an import, that the *right of sale* is not an incident of an import.

This, indeed, is the necessary conclusion from what was the actual decision of the whole Court, but it is not expressed by any of the Judges, except Mr. Justice *Daniel* and Mr. Justice *Woodbury.* They express it, each for himself. (5 *How.* 615, 616, 619.) The latter uses this strong language—"*It is manifest,* also, whether as an *abstract* proposition or *practical* measure, that a prohibition to import is one thing, while a prohibition to sell without a license, is *another* and *entirely* different".

It is true, the other Judges do not disavow, in words, the principles of *Brown vs. Maryland.* They adopt a different mode, but one which equally effects the same object—the gen-

tle mode of making a distinction where there is not a difference—a mode long since canonized by the courtesy or timidity of Courts, but a mode which is a most fruitful source of litigation. When a case is overruled, why ought it not to be overruled effectually, so that it may no longer mislead?

Mr. Chief Justice *Taney*, Mr. Justice *Catron* and Mr. Justice *Nelson*, put their judgments chiefly, if not altogether, upon the ground that the Laws of Massachusetts and R. Island only interfere with the retail selling of the article imported, after it has left the hands of the importer, and not with the wholesale selling of it while it remains in his hands. But this, as we have seen, is sufficient to overrule the whole case of *Brown vs. Maryland.* This takes its life out of it.

Mr. Justice *McLean* and Mr. Justice *Grier*, also put their decisions upon this ground, in part, and in part upon the ground that the States retain a " police" power, and that these Laws of Massachusetts and R. Island, as well as those of N. Hampshire, were made in the exercise of that power.

Now, if a Law, regulating the sale of wines and spirituous liquors, is a Police Law, why is not a Law, regulating the sale of any other commodity, equally a Police Law? That wines and spirits are ordinary articles of traffic—indeed, most important articles of traffic, is known to all. At the time when this decision was made, viz: 1847, the value of imported wines and spirits amounted to over $3,000,000, a value greater than that of any other article of foreign commerce, except three or four. They are made articles of traffic by the Commercial Acts of Congress. If, therefore, a State, by virtue of its Police Power, may regulate their sale, notwithstanding those Acts, why may it not, by virtue of the same power, regulate the sale of any other article, made an article of traffic, by those Acts? And if this be so, the amount of it is, that a State may, by virtue of its *Police Power*, impose a tax on the sale of any article brought into it from abroad, as soon as it enters its territory, whether it be in the hands of the importer or in the hands of any body else. And this result is equally fatal to the decision in *Brown vs. Maryland.*

Padelford, Fay & Co. *vs.* Mayor and Ald. City Savannah.

[2.] Upon the whole, it seems necessary to say that the case of *Brown vs. Maryland,* is overruled by these License Cases. And this effect have also the decisions in the Passenger Cases.

These cases arose out of Laws made by Massachusetts and N. York, respectively, which Laws declared, in substance, that no alien passenger should land on their shores, until he had paid a tax.

A question was made before the Courts of New York and Massachusetts, respectively, whether these Laws were not in violation of the aforesaid two clauses of the Constitution. The Supreme Court of New York decided that the N. York Law was not. Its decision was appealed from, and the case was carried before the Court of Errors of N. York. That Court affirmed the decision.

The Supreme Court of Massachusetts, also, decided the Massachusetts Law not to be unconstitutional.

Both cases were carried up to the Supreme Court of the U. S. and that Court decided, by five Judges to four, Justices *Wayne, Catron, McLean, Grier and McKinley,* to Chief Justice *Taney,* Justices *Nelson, Daniel* and *Woodbury,* that the Law was unconstitutional.

The ground on which the majority put their decision was, that as long as the passenger remained on shipboard, he was to be considered an import, and to belong to foreign commerce, which import Congress had "regulated" by law, and that any tax on it by a State, was both a tax upon an import and a regulation of commerce, and was therefore prohibited by each of the aforesaid clauses of the Constitution. They held, however, that *as soon as* the passenger leaves the ship and lands and mingles with the citizens of the State, he becomes a subject of State taxation. Mr. Justice *McLean* said, "It is a tax upon a commercial operation—upon what may, in effect, be called *an import.* In a commercial sense, no just distinction can be made, as regards the Law in question, between the transportation of merchandize and passengers. For the transportation of both, the ship-owner realizes a profit, and each is the subject

of a commercial regulation by Congress. When the merchandize is taken from the ship, and becomes mingled with the property of the people of the State, like other property, it is subject to the local Law; but until this shall take place, the merchandise is an import, and is not subject to the taxing power of the State, and the same rule applies to passengers. *When they leave the ship and mingle with the citizens of the State, they become subject to its Laws*". (7 *How.* 405.)

Of the other Justices, of the majority, *Wayne* and *McKinley* concurred with *McLean;* and *Catron*, in his opinion, also occupied this ground; and with him concurred *Grier*. *Catron* said—"Again, give the argument all the benefit it claims, *concede the full municipal power of the State to tax all persons within her territory, as a general rule, whether they have been there a year or an hour*, and still she could not impose a capitation tax on these passengers, by the hand of her own tax collector. The tax was demanded while they were *on board*". (7 *How.* 447.) And again, "It is also insisted that the States may tax all persons and property within their respective jurisdictions, except in cases where they are affirmatively prohibited. This is a truism not open to denial. But Constitutional exceptions to the State power, are so broad as to render the claim valueless in the present instance. States cannot lay export duties, nor duties on imports, nor tonnage duties on vessels. If they tax the Master and crew, they indirectly lay a duty on the vessel. If the passengers *on board are taxed, the protected goods, the imports*, are reached". (*Ibid.* 452.)

The position, then, of the majority is, that the passenger, as long as he remains on shipboard, continues to be an import and an article of foreign commerce, not taxable by a State; but as soon as he steps on land and mingles with the citizens, he ceases to be an import, and ceases to belong to foreign commerce, and becomes taxable by the State on whose shores he steps. Now, in the case of *this* "import," there can be no "breaking of bulk,' no opening of "package," no "sale by retail or by wholesale," after it enters the country, to effect this change. The passenger—import—steps from ship to shore;

that makes the transformation.   And why not?   there is but one step from the sublime to the ridiculous.   But according to *Brown vs. Maryland*, something has to be done, *after the import gets on shore*, before it ceases to be an import.   It does not cease to be one the instant it enters the country.   *Marshall*, C. J. says: "But while we admit that there must be a point of time when the prohibition ceases, and the power of the State to tax commences, we cannot admit that this point of time *is the instant* that the articles enter the country".   The decision of the majority, in these passenger cases being, that the instant the import—the passenger—enters the country, he becomes taxable by the State, that decision necessarily overrules the decision in *Brown vs. Maryland*.

Is it to be said that from the peculiarity of *this* import—the dash of the human which it has in it—the condition as to "breaking package" and so forth, applicable to ordinary imports, to make them cease to be imports, is to be dispensed with?   Be it so ; still, there is left enough in the decision to overrule *Brown vs. Maryland*.   The point of the decision in that case is, that a State has no power by which it can defeat importations, and that a power to tax the import whilst it is an import, is a power by which it could defeat importations.

Now, as we have seen, a power to tax the article of import, after it has ceased to be an import, by being mixed " with the mass of property of the country", a power to tax it in any of its forms, divided or undivided, or at any of its stages, including the last stage, that of its consumption, is, if exerted, just as effective to defeat its importation as is a power to tax it whilst it is in the hands of the importer, and before it has ceased to be an import; so, a power to tax passengers after they have landed is, if exerted, equally as effective to keep them from ever landing—from ever thinking of trying to land—as is a power to tax them before they have landed.

But notwithstanding this, the majority of the Judges consider the State to have the power to tax the passenger, after he has landed and mingled with its citizens ; to have the power to pass a Law, the effect of which would be, to prevent passen-

gers from landing at all; that is to say, to have a power by which it can stop immigration—importation. This is in the tush of *Brown vs. Maryland.*

[3.] The decisions, therefore, in the passenger cases, over-rule *Brown vs. Maryland.*

[4.] The decision of the Supreme Court of the U. S. in *Groves et al. vs. Slaughter,* affirms the principles laid down by the same Court, in the New Hampshire License Case, viz: that as to commerce between State and State, the States may regulate, provided they do not make any regulation which shall be in conflict with some regulation of Congress. (15 *Peters,* 510.) The question in *Groves et al. vs. Slaughter,* was as to à State's right to prohibit the introduction of slaves into its limits, " as merchandize or for sale." The Court held, *Baldwin* dissenting, that a State had this right. And would any one maintain that a State had not equally this right, with respect to the importation of slaves from Africa or Cuba ? Yet, if *Brown vs. Maryland* be Law, a State could not do that. That could only be done by Congress.

But if the case of Brown *vs.* Maryland has not been over-ruled I think it should be. I consider it to be a decision not warranted by the Constitution.

[5.] Whether it is or not, is therefore a question which I now proceed to discuss. In discussing it, I shall assume one proposition to be true, that the Constitution, like every other instrument made by men, is to be construed *in the sense in which it was understood by the makers of it at the time when they made it.* To deny this is to insist that a fraud shall be perpetrated upon those makers or upon some of them.

Can the sense in which the makers of the Constitution understood it at the time they made it, be now ascertained ? The Constitution was made by conventions, of the States called for the purpose of examining its meaning, and of adopting or re-jecting it according as they liked that meaning or disliked it. These conventions were, in the great majority of cases, divided into two parties, one in favor of adopting the Constitution, and the other against adoption unless it should be amended. These par-

ties debated the important clauses of the Constitution and otherwise manifested their sense of its meaning. The proceedings of a large majority of these conventions are preserved. They are to be found in Elliot's Debates. This, then, is one source from which the sense in which the makers of the Constitution understood it is to be drawn.

How from this source? It is manifest, that what the party friendly to adoption said, was the meaning of the Constitution, was the meaning which they understood it to have, was the meaning which the makers of the Constitution understood it to have; for they being the majority were the makers of it. Now these debates and proceedings show what the party friendly to the adoption of the Constitution said was this meaning.

They also contain the acts of ratification and the propositions and recommendations for amendment of the Constitution—of its makers. These all throw light on the subject.

There are other sources from which evidence may be drawn, such as the contemporary and continued Acts of the States, showing their view of the meaning of the Constitution, and the manifestations of popular sentiment about the time of the adoption of the Constitution, or soon afterwards, and since, showing what the people thought in respect to its meaning.

The question what the makers of the Constitution meant by the instrument which they made, is eminently a question of *fact*. It is, in its own nature, in the highest degree historical. To get the meaning fully, we must have a view of the Act—the actors and the circumstances—we must see the instrument itself—the makers of the instrument—and the facts standing around the instrument.

I pretend not to see all this—still I think I see some of it, and what I see I shall attempt to bring forward.

It will appear, I think, from the evidence which I shall produce that the sense in which the makers of the Constitution understood it, when they made it, is expressed in the following propositions :

1. That the Constitution delegated to the General Govern-

ment or any department thereof, no power by *implication*, but only delegated such powers as it *expressly enumerated.*

2. That it delegated no exclusive power, unless the delegation was *said* to be exclusive.

3. That it laid no prohibition upon the States, except such as it specified.

4. That the words used in it, if susceptible of more meanings than one, were used in the meaning which was least favorable to the delegation of power, and most favorable to its retention.

Let us, then, go to the proofs. And first, to those contained in the debates and proceedings of the State Conventions which agreed to the Constitution. In these proofs will be found evidence to apply to all of the four propositions, but exponently to the first, second and third. I shall not, in every instance, stop to show the application of the evidence to the particular point to which it will apply.

Let us commence with the convention of Massachusetts.

In this convention, Parsons, a friend to the adoption of the Constitution, and after its adoption, the most distinguished Judge that Massachusetts ever had, said, " It was objected that by giving Congress a power of direct taxation, we give them power to destroy the State Governments by prohibiting them from raising any moneys : but this objection is not founded in the Constitution. Congress have only a *concurrent right* with each State in laying direct taxes—not *an exclusive* right—and the right of each State is equally *extensive and perfect* as the right of Congress. Any law, therefore, of the U. S. for securing to Congress more than a *concurrent* right with each State is usurpation and void." (2 *Ell. Deb.* 93.)

The paragraph which provides " That the writ of *habeas corpus* shall not be suspended, unless in cases of rebellion or invasion" " Was read, when, after a question by Gen. Thompson, Hon. Mr. Adams, in answer to an inquiry of the Hon. Mr. Taylor, said, that this power, given to the General Government, to suspend this privilege in cases of rebellion and invasion, *did not take away the power of the several States, to suspend if they shall see fit.*" (2 *Ell. Deb.* 108.)

So Judge Sumner, " Congress have only power to, suspend the privilege to persons committed by their authority.   A person committed under the authority of the States will still have a right to this writ."   (*Id.* 109.)

After the debate had come to a close, " Mr. Parsons moved that this Convention do assent to and ratify this Constitution."

This motion seems to have been received with doubtful favor.   Gen. Heath, after some strong appeals to the Convention for a union, acknowledged, " But I have observed from the first, that many gentlemen appeared opposed to the system; and this, I apprehend, arises from their objections to some particular parts of it.   Is there not a way in which their minds may be relieved from embarrassment? I think there is". And then he proceeded to state the way which was to ratify the Constitution as it was; and at the same time propose amendments to it, to meet the objections to it.   (2 *Ell. Deb.* 122.)

After Gen. Heath sat down, his Excellency the President, (who was John Hancock) rose and observed, " That unfortunately, through painful indisposition of body, he had been prevented from giving his attendance in his place ; but from the information he had received, and from the papers, there appeared to have been a *great dissimilarity* of sentiments in the Convention.   To remove the objections of some gentlemen, he felt himself constrained, he said, to hazard a proposition for their consideration.   My motive, says he, arises from my earnest desire to this Convention, my fellow-citizens and the public at large, that this Convention *may adopt* such a form of Government as may extend its good influence to every part of the United States, and advance the prosperity of the whole world. His situation, his Excellency said, had not permitted him to enter into the debates of the Convention—*it however appeared to him necessary*, from what had been advanced in them, to adopt the form of Government proposed ; but observing a *diversity* of sentiment in the gentlemen of the Convention, he had frequently had conversation with them on the subject ; and from this conversation, he was induced to propose to them whether the introduction of some general amendments would

not be attended with the happiest consequences.    For that purpose, he should, with the leave of the Honorable Convention, submit to their consideration a proposition, in order to remove the doubts and quiet the apprehensions of gentlemen."

He then read his propositions—the first of them was in the following words : " First, that it be *explicitly* declared, that all powers not *expressly* delegated by the aforesaid Constitution, are reserved to the several States, to be by them exercised."

These propositions being thus submitted to the Convention, John Adams moved that they should be taken under consideration by the Convention.    (2 *Ell.* 120, 121, 122, 123, 125.)

He prefaced his motion with a speech, in which these words are to be found: " Mr. President, I feel myself happy in contemplating the idea that many benefits will result from your Excellency's conciliatory proposition to this Commonwealth and to the United States ; and I think it ought to *precede* the motion made by the gentleman from Newberryport, (Parsons, the motion being to ratify the Constitution) and to be at this time considered by the Convention.    I have said that I have had my doubts of this Constitution.    *I could not digest every part of it as readily as some gentlemen;* but this sir, is my misfortune—not my fault.    *Other gentlemen have had their doubts ;* but in my opinion, the proposition will have a tendency to remove such doubts, and to conciliate the minds of the Convention and the people without doors."    " I have observed the sentiments of gentlemen on this subject, as far as Virginia ; and I have found that the objections were similar in the newspapers, and in some of the Conventions."    (2 *Ell. Deb.* 123-4.)

This motion was debated ; and Mr. Adams again spoke.—He said, among other things, " Your Excellency's first proposition is, ' that it be *explicitly* declared, that all powers not expressly delegated to Congress, are reserved to the several States, to be by them exercised.'    This appears to my mind to be a summary of a bill of rights, which gentlemen are anxious to obtain.    It removes *a doubt* which many have entertained, respecting the matter."    " It is *consonant with the second article in the present Confederation.*"    (*Id.* 131.)

*Parsons, Dana, Strong* and others, warm friends of the Constitution, earnestly urged the adoption of the proposition.

At length the proposed amendments were referred to a committee. This committee reported a form of ratification applicable to the Constitution ; and added to the form these words : " And as it is the opinion of *this Convention,* that certain amendments and alterations in the said Constitution, would remove the fears and quiet the apprehensions of many of the good people of this Commonwealth, and more effectually guard against an undue administration of the Federal Government, the Convention do therefore recommend that the following alterations and provisions be introduced into the said Constitution : First, that it be *explicitly declared,* that all powers not *expressly* delegated by the aforesaid Constitution, are reserved to the several States, to be by them exercised."

Then follow eight others—then is added : " And the Convention do, in the name and in the behalf of the people of this Commonwealth, *enjoin it upon their representatives in Congress,* at all times, until the alterations and provisions aforesaid have been considered agreeably to the 5th article of the said Constitution, to exert all their influence, and use all reasonable and legal methods to obtain a ratification of the said alterations and provisions, in such manner as is provided in said article."

The question was then put, whether the Convention would accept of this report ; and it was decided in the affirmative, by a *close* vote, viz : 187 to 168. (*Id.* 176-7-8.)

It is apparent, from these few extracts, that there was a very strong opposition to the Constitution—one so strong as to make it extremely doubtful whether a majority could be obtained for its adoption. This opposition, it appears too, all rested on objections which resolve themselves into this : the State was giving up too much power to the General Government ; especially as there was some room to doubt the extent of some of the grants of power. It is evident that power was a thing which the Convention wished to give, in the very least possible quantity ; and it is equally evident that they were anxious to remove

everything from which the unscrupulous might argue that they had granted more power than they had actually *expressed* in the grant. Hence, they were not satisfied with assurances from the friends of the Constitution, that the States would have ' concurrent' power with the General Government, as to taxes ; the habeas corpus, &c. ; and that this concurrent power would be 'perfect'—that is to say, notwithstanding assurances that it was necesssarily to be *implied* that no power was given to the General Government, except such as was *expressly* given ; and none given *exclusively*, except it was said to be exclusive. These friends had to go farther : they had to agree to enjoin it upon their Representatives in Congress, " To exert all their influence, and use all reasonable and legal methods to obtain a ratification of said alterations and provisions", one of which was, as we have seen, " That it be *explicitly declared*, that all powers not *expressly delegated* by the aforesaid Constitution, are reserved to the several *States*, to be by them exercised."

The meaning of this article plainly is, that although it is *already*, as we think, *impliedly* declared that all powers not *expressly* " delegated" " are reserved", yet we want it also *expressly* declared.

So much for the sense in which Massachusetts understood the Constitution, when she agreed to it. Let us proceed to Connecticut.

We have only a fragment of the Connecticut debates on the question of the adoption of the Constitution. That contains, in all, four or five speeches only ; but among them, two of Oliver Ellsworth, who had been a member of the Convention which framed the Constitution, and who was to be Chief Justice of the Supreme Court of the United States. He said, " The first objection is, that this clause, (the power to lay and collect taxes, &c.) extends to all the objects of taxation. But though it does extend to all, it does not extend to them *exclusively*. It does not say Congress shall have all these sources of revenue, and the States none ; *all* excepting the impost, *still lie open to the States*". (2 *Ell. Deb.* 190.)

Here is an admission, that a grant of a power to tax every person and thing taxable, and to tax them without limit, is not an exclusive grant—is not a grant of the whole taxing power, but only of half of it ; an admission that, notwithstanding such a grant, as much power is retained as is granted.   That is to say, an admission that although just as much power to tax is given to the General Government, as by the use of language can be given it ; yet, it is not to be *implied* from thence that equally as much power is not retained by the States ; that unless it were also expressly said in the Constitution this power is *exclusively* granted to Congress, or *prohibited* to the States, the States have it concurrently.   Now if, from such a grant as this, no *implication* was to be made in favor of the General Government, or against the States, was not the Convention obliged to infer that such an implication could not be made from *any* merely affirmative grant ; such, for instance, as the grant to regulate commerce.

Taking, then, Judge *Ellsworth* as a true exponent of the idea of the Constitution entertained by the Convention of Connecticut, we must say that that idea was much the same as the idea of the Massachusetts Convention.   Let us pass to N. Hampshire.

We have no debates of the Convention of this State, and only the fragments of one speech, and that confined to the slavery clause ; but we have, in the form of ratifying the Constitution, matter from which we may infer what was the understanding of the Convention, as to the meaning of the Constitution when they agreed to it.   They adopt the Massachusetts form, including the proposed amendments and the injunction upon their members in Congress, to use their best efforts to get the amendments made.   They, therefore, had the same understanding, as to this meaning, which Massachusetts had.   And what that was we have seen.   (1 *Ell. Deb.* 325, '6.)

Let us, then, come to the great State of N. York.

The question of adopting the Constitution, was ardently debated in the Convention of this State, and the division of parties on it, was almost equal.

The friends of adoption urged, in respect to the great power of taxation, that it would be *concurrent*. To this, Williams, an opposer of adoption, answered, " Suppose, however, that the States have concurrent jurisdiction with Congress, in taxation, it is evident, as the Laws of Congress are the Supreme Laws of the land, that their taxes, whenever they interfere with the taxes laid by the States, must and will claim a priority as to the collection ; in fact, that they may, in order to pass the Laws necessary for the end, abolish the *State taxes*".

This brought Alexander Hamilton to his feet. He combatted this idea most vehemently. He said, " With regard to the jurisdiction of the two Governments, I shall certainly admit that the Constitution ought to be so formed as not to prevent the States from providing for their own existence ; and I maintain that it is so. formed. This is conceded by one gentleman, and in the next breath the concession is retracted. He says Congress have but one exclusive right in taxation ; that of duties on imports. Certainly, then, their powers are only concurrent. But to take off the force of this obvious conclusion, he immediately says that the laws of the U. S. are supreme, and that where there is one supreme, there can be no concurrent authority. And further, that where the Laws of the Union are supreme, those of the State must be subordinate, because there cannot be two supremes. This is curious sophistry. That two supremes cannot act together is false. They are inconsistent only when aimed at each other, or at an indivisible object. The Laws of the United States are Supreme, as to all their proper Constitutional objects. The Laws of the States are supreme in the same way. Suppose both Governments should lay a tax of a penny on an article, had not each an independent and uncontrollable power to collect its own tax ? The meaning of the maxim—there cannot be two supremes—is simply this : two powers cannot be supreme over each other". That is to say, that with respect to *one* concurrent power, that of taxation, the General Government cannot be supreme over the State Governments, nor the latter supreme over the former ; and if this is true of one such power, it is

true of all; and as nearly all of the granted powers are such, it must be true of nearly all the granted powers—Legislative, Executive and Judicial.    This inference was too obvious for the Convention not to have made it.

This touch of State rights was displayed, it is to be remembered, however, before the Constitution was adopted; and in order to make it palatable to the States, and so get them to swallow it.    (2 *Ell. Deb.* 355, '6.)

Not satisfied with this, he returns to the subject next day. He enlarges; he becomes more emphatic; he illustrates, and he generalizes.    The speech is a most noteworthy one.    I shall indulge myself in citing it somewhat fully.    He says—" Sir, with respect to the subject of revenue, which was debated yesterday, it was asserted, that in all matters of taxation except in the article of imposts, the united and individual States had a concurrent jurisdiction, and that the State Governments had an independent authority to draw revenues from every source but one.    The truth of these positions will appear on a slight investigation.    I maintain that the word *supreme* imports no more than this : that the Constitution and Laws, made in pursuance thereof, cannot be controlled or defeated by any other Law.    The Acts of the United States, therefore, will be absolutely obligatory, as to all the proper objects and powers of the General Government.    The States, as well as individuals, are bound by these Laws ; but the Laws of Congress are restricted to a certain sphere, and when they depart from this sphere, they are no longer supreme or binding.    In the same manner, the States have certain independent powers, in which their Laws are supreme ; for example, in the making and executing Laws concerning the punishment of certain crimes, such as murder, theft, &c. the States cannot be controlled.    With respect to certain other objects, the powers of the two Governments are concurrent, and yet supreme.    I instanced, yesterday, a tax on a specific article.    Both might lay the tax—both might collect it, without clashing or interference.    If the individual should be unable to pay both, the *first seizure* would

hold the property.    Here, the Laws are not in the way of each
other; they are independent and supreme.

"The case is like that of two creditors: each has a distinct
demand; the debtor is held equally for the payment of both.
Their suits are independent, and if the debtor cannot pay both,
he who takes the first step secures his debt.    That the States
have an undoubted right to lay taxes in all cases in which they
are not prohibited, is a position founded on the *obvious* and
*important* principle in Confederated Governments, *that what-
ever is not expressly given to the Federal Head, is reserved to
the members.*    The truth of this principle must strike every
intelligent mind.    In the first formation of Government, by
the association of individuals, every power of the community is
delegated, because the Government is to extend to every possi-
ble object; nothing is reserved but the inalienable rights of
mankind; but when a number of these societies unite for cer-
tain purposes, the rule *is different*, and from the plainest rea-
son; they have already delegated their sovereignty and their
powers to their several Governments; and these cannot be re-
called and given to another, without an *express* Act.    I submit
to the committee, *whether this reasoning is not conclusive*".
(*Ibid*, 361, '2, '3.)

This is plain talk.    "Whatever is not expressly given to the
Federal head is reserved to the members".    This *is* applicable
not merely to the tax clause.    It covers the whole of the pow-
ers spread out in the Constitution.    And it comes from the
very highest quarter.    Col. Hamilton was the first man of his
day of his party.    He had been too a member of the Federal
convention which framed the Constitution, and he entirely
*knew*, as much as any living man, what were the purposes and
objects of those who were the chief architects of that instru-
ment in that Convention, as well as what were the fears and
doubts of those who were not its chief architects.    And in order
to get the great State of New York to adopt it when the question
of adoption is a touch and go one, he tells it in his place in this
manner so passionately earnest that the Constitution conveys
to the General Government no power except such as is express-

ly granted.    Can falsehood be imputed to Alexander Hamilton ?    If it cannot, this was the truth of the case, for *he* was not deceived himself.

But if he were, can there be a doubt that such a declaration as this did not make its impression on those who heard it—that in a word, in adopting the Constitution, the adopters did not take it as having this meaning.    And if they so understood it and were made so to understand it by him and his friends (for none of those uttered a word of dissent) so it is to be understood.— That is the meaning which they agreed to.

What was said by Chancellor Livingston and by John Jay went to confirm these declarations of Hamilton's.    (2 *Ell. Deb.* 346, 381.)

Even with all this the Convention could barely be induced to agree to the Constitution.    The vote was thirty-nine in favor of it to thirty-six against it.    And the ratification itself was exceedingly circumspect and guarded.    It was preceded by a declaration of principles generally, and of principles applicable especially to the instrument they were about to agree to. It declared, among other things, " That the powers of Government may be re-assumed by the people whensoever it shall become necessary to their happiness, that every power, jurisdiction and right which is not by the said Constitution clearly delegated to the Congress of the United States, or the departments of the government thereof remains to the people of the several States, or to their respective State governments, to whom they may have granted the same, and *that those clauses of the Constitution which declare that Congress shall not have or exercise certain powers, do not imply that Congress is entitled to any powers not given by said Constitution, but such* clauses are to be construed either as exceptions to certain *specified* powers, or as inserted merely for greater caution".    That is, no power is to be held to be conveyed by implication.

After going through with the declaration of rights, the form of ratification proceeds thus : " Under these impressions, and declaring that the rights aforesaid cannot be abridged, and that *the explanations aforesaid are consistent* with the said

Constitution", &c.    We do assent to and ratify the said Constitution.

Now, the question is, did the New York Convention, in agreeing to the Constitution, think it was giving away to the General Government more of the power of New York State than Alexander Hamilton told them they were giving—more, in a word, than they were *asked* to give ?    They were told by Hamilton that it is an " Obvious and important principle in confederated governments, that whatever is not *expressly* given to the Federal head, is reserved to the members."    The Convention then was only requested to give such powers as were *expressed and no others*.    This was the extent of the request.    Is it to be presumed that the Convention, exceedingly suspicious as they were of the Constitution, at first gave more than they were requested to give ?

If by any possible straining of words that could be presumed, the presumption would be rebutted by the form of the ratification.    When this form says " That those clauses in the said Constitution which declare that Congress shall not have or exercise certain powers, do not *imply* that Congress is entitled to any powers not given by the said Constitution."    It says that no clauses in it shall do this ; for if an implication of a grant cannot be drawn from these clauses, still less can it be drawn from any other : and this is the same as saying that no *implied* power is granted to Congress : but only express powers are granted.

This, then, is what New York understood she was doing, when she agreed to the Constitution, viz : that she was giving to the General Government the powers *expressed* in the instrument, but no others—not one implied power ; and that she was giving no expressed power exclusively, unless it was said to be exclusive.

Let us pass on to another State's proceedings, Pennsylvania.

In the Convention of this State for ratifying the Constitution, the friends of the Constitution seem to have had the field of debate pretty much to themselves—and of those friends, Judge Wilson, who had been a leading member of the Federal

Convention which framed the Constitution, the member who, probably, next to Madison, had the greatest share in framing it as it was framed, appears to have been eminently conspicuous.

McKean, who was afterwards Chief Justice of the State, made a speech or two.   One of his speeches was elaborate and careful.   I shall quote from him and Wilson to show what meaning they told the · Convention the Constitution had when persuading the Convention to agree to it.

In this Convention, as in those of the other States which have been noticed, it seems to have been a prominent objection to the Constitution that it contained no bill of rights.   In answer to this, Wilson says in one place, " It is urged as a general objection to this system that the powers of Congress are unlimited and undefined, and that they will be the judges in all cases of what is necessary and proper for them to do."   " To bring this subject to your view, I need do no more than point to the words in the Constitution, beginning at the 8th Sec. Art. 1st.   "The Congress (it says) shall have power," &c.   I need not read over the words, but I leave it to every gentleman to say whether the powers are not accurately and minutely defined as can well be done on the same subject in the same language.   The old Constitution is as strongly marked on this subject, and even the concluding clause, with which so much fault has been found, gives no more or other powers, nor does it in any degree go beyond the particular enumeration ; for when it is said that Congress shall have power to make all laws which shall be necessary and proper, those words are *limited and defined by the following :* " *For carrying into execution the foregoing powers*".   It is saying no more than that the powers which we have already *particularly* given shall be effectually carried into execution."   (2 *Ell. Deb.* 468.)   And again, " *Eodem die P. M.* he said, " Whoever views the matter in a true light, will see that the powers are as minutely *enumerated and defined as was possible,* and will discover that the general clause against which so much exception is taken, is nothing more than what was necessary to render effectual the particular

powers that are granted.    And again " Can any cause of distrust arise here ?    Is there any *increase* of risk ? or rather are not the enumerated powers *as well defined here as in the present articles of Confederation ?*    (*Ibid.* 481, 2.)

Now be it remembered that the "present articles of confederation" had in them this distinct article :

### "ARTICLE II.

Each State retains its sovereignty, freedom and independence, and every power, jurisdiction and right which is not by this Confederation *expressly* delegated to the United States in Congress assembled".

Judge Wilson then means to persuade the Convention he is addressing, that although this clause is not contained in the new instrument, yet the powers intended to be delegated by that instrument are no greater or other than they would be if it were contained in the instrument—agreeing, doubtless, with Hamilton, that " In Confederated Governments, whatever is not *expressly* given to the Federal head, is reserved to the members."

Indeed, all the rest of what has been quoted from him and much more that has not been quoted, amounts to the same thing.    Could the Convention be supposed to doubt Wilson in respect to this point ? especially when he was seconded by Judge McKean in this style.    As to the objection that there was no bill of rights, Judge McKean said " Again, because it is *unnecessary ;* for the powers of Congress being derived from the people in the mode pointed out by this Constitution, and being therein *enumerated* (that is, *expressed* ONE BY ONE) and *positively* granted, *can be no other* than what this positive grant conveys.    (*Locke on Government, vol. ii b.* 2, *chap.* 2. *sec.* 140, and in the 13*th chap. sec.* 152.    2 *Ell. Deb.*)

With this exposition of the meaning of the Constitution, by these two distinguished friends of it, (Wilson was afterwards a Judge of the Supreme Court of the U. S.) the Convention of Pennsylvania adopted it.    And can it be doubted that the Convention understood the Constitution in this sense.

Let us pass to another State, N. Carolina.   In the Convention for ratifying the Constitution in that State, Mr. Maclaine, replying to those who objected to the Constitution, that it contained no bill of rights, said, "It would be very extraordinary to have a bill of rights, because the powers of Congress are *expressly* defined, and the very definition of them is as valid and efficacious a check, as a bill of rights could be, without the dangerous implication of a bill of rights.   The powers of Congress are limited and *enumerated* again : "It is as plain a thing as possibly can be, that Congress *can have no power*, but what we EXPRESSLY give them.   (4 *Ell. Deb.* 140–1.)

Gov. Johnston, the President of the Convention, in answer to the same objection, said, "The Congress cannot assume any other powers than those *expressly* given them, without *a palpable* violation of the Constitution.   (*Ibid,* 142.)

Judge Iredell, who had been a member of the Federal Convention, for drafting the Constitution, and who was to become a Judge of the Supreme Court of the U. S., and who was in himself, a man of clear head, replying to the same objection, said, "Of what use therefore, can a bill of rights be in this Constitution, where the people *expressly* declare how much power they do give ; and consequently retain all they do not ? It is a declaration of *particular* powers by the people to their representatives for particular purposes.   It may be considered as a great *power of attorney*, under which no power can be exercised, but what is expressly given.   Did any man ever hear before, that at the end of a power of attorney, it was said the attorney should not exercise more power than was there given him."   Is not this the true idea of all Constitutions ?   They are instruments by which principals—people— confer power—powers upon *servants, agents*, presidents, members of Congress—Judges.   These have but a *naked* authority —one coupled with no interest—one founded on no consideration ; one, therefore, which is to be construed *strictly*.   In a dispute between the principal and agent, as to the meaning of the power of attorney, does it lie in the mouth of the agent, to pronounce what is the meaning ?   Just the opposite.   The

principal may, at will, revoke the whole power; may he not, then, do the lesser thing—interpret its meaning?

In spite, however, of all that the friends of the Constitution could say, the Convention actually *rejected* it, by a great majority—by 184 to 84.

The Convention determined that the Constitution ought to be amended, before it should be agreed to by N. Carolina; and that it ought to be amended so as to contain these, among other things:

"1. That each State in the Union shall respectively retain every power, jurisdiction and right which is not, by this Constitution, delegated to the Congress of the United States, as to the departments of the Federal Government."

"17. That those clauses which declare that Congress shall not exercise certain powers, be not interpreted in any manner to extend the power of Congress; but that they be construed either as making exceptions to the specified powers where this shall be the case, or otherwise, as inserted merely for greater caution." (*Id.* 244-6.)

Notwithstanding that the friends of the Constitution told the Convention that this was all that the Constitution meant as it stood unamended, the majority would not be satisfied, but insisted upon having it so nominated in the bond.

Afterwards N. Carolina, by Convention, agreed to the Constitution. But it is not to be presumed that she considered the Constitution to convey to the General Government more powers than its friends, Maclain, Johnston and Iredell, being the spokesmen, represented it to convey; that is to say, more than the *express* powers.

We have only three or four speeches made in the Convention of South Carolina, which ratified the Constitution; and they not very pertinent to the point under consideration. But we are at no loss to know what that State considered herself as giving to the General Government, when she agreed to the Constitution. We may know this from two sources. First, from the form of ratification. The ratification was preceded by this declaration, " This Convention doth also declare, that

no section or paragraph of the said Constitution *warrants* a construction that the States do not retain every power not *expressly* relinquished by them, and vested in the General Government of the United States". (1 *Ell. Deb.* 325.)

Second.   From the action and debates of the Legislature which called the State Convention for ratifying the Constitution.   That Legislature debated the Constitution itself, at considerable length, before it would ever make a call of such a Convention.   That Legislature was composed of some of the first men of the State.   Among them were Charles Pinckney, Charles Cotesworth Pinckney, John Rutledge and Pierce Butler, the members from South Carolina to the Federal Convention which drafted the Constitution.   These were all friends of the Constitution.   In persuading the Legislature to make the call, and in answer to objections to the Constitution, that it does not guaranty liberty of the press, Gen. Pinckney said, "The General Government has *no powers but what are expressly granted* to it".   (4 *Ell. Deb.* 315.)   No friend of the Constitution said nay to this.   The Legislature, therefore, determined *to* call the Convention, and did call it; and that Convention agreed to the Constitution, in the manner above stated.

The S. Carolina Convention then took the Constitution to convey only *express* powers.

Rhode Island, like N. Carolina, would not, for a long time, accept the Constitution at all.   When she did accept it, she accompanied the act with certain explanations and declarations; which explanations she declared to be consistent with the Constitution.   Among them was this: "That the rights of the States, respectively to nominate and appoint all State officers, and every other power, jurisdiction and right, which is not, by the said Constitution, clearly delegated to the Congress of the U. S., or to the departments of the Government thereof, remain in the people of the several States, or their respective State Governments, to whom they may have granted the same; and that those clauses in the Constitution, which declare that Congress shall have or exercise certain powers, *do not imply*

that Congress is entitled to any power not given by the Constitution; but such clauses are to be construed as exceptions to certain *specified powers*, or as inserted merely for greater caution.''

Rhode Island, like the rest, thought, in agreeing to the Constitution, she was giving only such powers as she mentioned expressly.

Let us pass to the great State of Virginia.

It was only after a mighty struggle, that the friends of the Constitution could induce the Convention of Virginia to adopt the Constitution at all.   Patrick Henry, George Mason, James Monroe, Grayson, and other distinguished men opposed its adoption, without previous amendments.   Pendleton, Nicholas, Randolph, Marshal, afterwards C. Justice of the S. Court of U. S., Madison, and others of note, urged its adoption.   After a protracted debate, and pledges on the part of its friends, that certain amendments should be made to it, if they could cause that to be done, it was accepted ; but with a declaration accompanying the act, showing very clearly, that the Convenvention did not consider the Constitution as conferring on the General Government any powers but those expressed in it.

But what power did its friends say it conveyed, when they were engaged in the business of persuading the Convention to take it ?   Let them speak for themselves.

Mr. Tyler had said—'' Suppose that the time should come that a King should be proposed by Congress ?   Will they not be able, by the sweeping clause, to call in foreign assistance and do whatever they think proper, to carry this proposition into effect?

To this Mr. Madison replied, '' With respect to the supposed operation of what was denominated the sweeping clause, the gentleman, he said, was mistaken; for it only extended to the *enumerated* powers.   Should Congress attempt to extend it to any power *not enumerated*, it would not be warranted by the clause''.   (3 *Ell. Deb.* 455.)

The '' sweeping clause'' is the one which declares that Congress '' Shall have power to make all Laws which shall be nec-

essary and proper for carrying into execution the foregoing power", &c.

What Mr. Madison says, amounts, then, to this: that this clause does not give Congress power to make any Law for carrying into execution any power that is not "enumerated" in the Constitution: that is to say, for carrying into execution any implied power.

And this is the same as saying the Congress has no implied powers at all; for it is saying, that if they have implied powers, they yet have no power to carry them into effect—the clause giving Congress power to carry powers into effect, not extending to implied powers.

Again he said, "As to a solemn declaration of our essential rights, he thought it unnecessary and dangerous—unnecessary, because it was evident that the General Government had no power but what was given it, and dangerous because an enumeration which is not complete, is not safe".

Now, a "declaration" or enumeration of reserved rights, could not be said to be unnecessary, unless there was an enumeration of delegated rights; saying, then, that such declaration or enumeration of *reserved rights* was unnecessary, Mr. Madison said that there was an enumeration, a counting out, one by one, of the delegated powers.

So, such enumeration or "declaration" of reserved rights, would only be "dangerous," because an enumeration of reserved rights would give ground to the implication that all rights not enumerated, were delegated, and a complete enumeration of reserved rights, is a difficult thing to accomplish; whereas, if the delegated powers are the ones that are enumerated, as is the case with the Constitution, as it stands, the implication will be that all powers not enumerated are reserved. Mr. Madison said to the Convention, in effect, adopt the Constitution as it stands—you give away no power that you do not enumerate.

Gov. Randolph's testimony is most explicit and detailed on this point. He says, "Permit me to return to that clause which is called by gentlemen the *sweeping clause.* I observed,

yesterday, that I conceived the construction which had been put on this clause *by the advocates of the Constitution, was too* NARROW, and that the construction put upon it by the other party, was extravagant. The *former* contend that it gives *no supplementary* power, but only enables them to make Laws to execute the delegated powers; or in other words, that it only involves the powers incidental to those *expressly* delegated. By *incidental powers*, (the *italics* are his,) they mean those which are *necessary* for the principal thing". This is Gov. Randolph's *testimony* as to what the *advocates* of the Constitution told the Convention it meant. He, himself, was hardly to be called an advocate of it. He spoke against it and voted against it in the Federal Convention, of which he was a member. Still, he went for ratifying it in this, the Virginia Convention. He, therefore, is as good a witness as could be, with reference to what the friends of the Constitution represented to be its meaning, when trying to get it ratified.

He then says, " Let me say that, in my opinion, the adversaries of the Constitution wander, equally, from the true meaning. The gentleman supposes that complete and unlimited Legislation is vested in the Congress of the United States. This supposition is founded on false reasoning. There is not a word said in the State Government, of the powers given to it, because they are general: but in the general Constitution the powers are *enumerated*. Is it not, then, fairly deducible, that it has no power but what is expressly given it ? for if its powers were to be *general*, an enumeration would be needless.

" But the insertion of the *negative restrictions*, (that is, on Congress,) has given cause of triumph, it seems, to gentlemen. They suppose that it demonstrates that Congress are to have powers by *implication*. I will meet them on that ground. I persuade myself that every exception here mentioned, is an exception, not from general powers, but from the *particular powers* therein vested".

He then goes through with *every* restriction on Congress, and shows that it is an exception out of some *expressly* delegated power, and out of no implied power. Here is a specimen of his

style of doing this : " To what power in the General Government is the exception made, respecting the importation of negroes ?   Not from a general power, but from a particular power, expressly enumerated.   This is an exception from the power given them, of regulating commerce".   He asks, " Where is the power to which the prohibition of suspending the *habeas corpus* is an exception ?   I contend, that by virtue of the power given to Congress, to regulate Courts, they would suspend the writ of *habeas corpus*.   This is, therefore, an exception to that power".   (3 *Ell. Deb.* 463, '4.)

Thus, he labors through these restrictions on Congress, to the end, insisting that even from them, it was not to be inferred that Congress was to have any implied power, or any power, except enumerated powers.

So George Nicholas, " But it is objected to for want of a bill of rights.   It is a principle *universally agreed upon*, that all powers not given, are retained".   That he means all not *expressly* given, we shall see.   " In England, in all disputes between the King and people, recurrence is had to the enumerated rights of the *people* to determine.   Are the rights in dispute reserved ?   Are they included in *Magna Charta*, Bill of Rights, &c. ?   If not, they are, generally speaking, within the King's prerogative.   In disputes between Congress and the people, the reverse of the proposition holds.   Is the right *enumerated ?   If not, Congress cannot meddle with it*".

" Which is the most safe ? the people of America know what they have relinquished for certain purposes.   They also know that they retain everything else, and have a right to resume what they have given up, if it be perverted from its intended object".   (*Ibid*, 246.)

But even these great names, speaking for the friends of the Constitution, were not enough to satisfy the Convention on this point of implied power.   John Marshall, subsequently to become Chief Justice of the U. S. had to take the stand and bear witness, too, on the point.   He spoke on the particular question, of the power of Congress over the Militia.   He said, " Could any man say that this power was not retained by the

States, as they had not given it away? For, says he, does not a power remain until it is given away"?

"For Continental purposes, Congress may call forth the militia; as to suppress insurrections and repel invasions. But the power given to the States by the people, is not taken away, for the Constitution *does not say* so. In the Confederation, Congress had this power, but the State Legislatures had it also. The power of Legislating, given them in the Ten Miles Square, is *exclusive*. ALL the restraints intended to be laid on the State Governments, (besides where an exclusive power is *expressly* given to Congress,) are contained in the 10th Section of the 1st Article. This power, (the Militia Power,) is not included in that section". (3 *Ell. Deb.* 419.)

Now, here, Judge *Marshall* goes this far, at least: that there is nothing in the Constitution from which you can *imply* any *restriction upon the States*. The restrictions upon the *States* are all expressed. We shall see, that when he asks the question, "Does not a power remain until it is given away"? he means to say, until it is *expressly* "given away".

For, afterwards, in speaking on the Judicial powers delegated by the Constitution, he says: "Has the Government of the U. States power to make Laws on every subject? Does he understand it so? Can they make Laws concerning the mode of transferring property, or contracts, or claims, between citizens of the same State? Can they go beyond *the delegated* powers? If they were to make a Law not warranted by any of the powers *enumerated*, it would be considered, by the Judges, as an infringement of the Constitution which they are to guard. They would not consider such a Law as coming under their jurisdiction; they would declare it void". (*Ibid*, 553.)

John Marshall then told the Convention of Virginia, to induce it to accept the Constitution, that the Constitution meant only this: to give from the States to the General Government, such powers as it "*enumerates*"—as it counts out to that Government—no more.

Under such assurances, from such quarters, the Convention ratified the Constitution, but they did it in such a way as to

show that they understood the Constitution to give the General Government no other powers than such as were expressed in it.

The Convention said, "We, the delegates, &c. do declare and make known, that the powers granted under the Constitution, being derived from the people of the United States, be resumed by them whensoever the same shall be perverted to their injury or oppression, and that every power *not granted, thereby remains with them and at their will.* That, therefore, no right, of any denomination, can be cancelled, abridged, restrained or modified, by the Congress ; by the Senate or House of Representatives, acting in any capacity ; by the President ; or any department, or officer of the United States, except in those INSTANCES in which power is given, by the Constitution, for those purposes, &c. With these impressions, &c. we do assent to and ratify the Constitution".

Now, the word "instances" means here, *specified* cases— *enumerated* cases. This is too plain to admit of a doubt. The Convention so understood it. Madison certainly did. (*Id.* 620.)

But the Convention did not stop here. They, at the same time, proposed certain amendments to the Constitution, to put this matter beyond doubt. Among the amendments was one to the effect that each State retains every power which is not delegated. Another, " That those clauses which declare that Congress shall not exercise certain powers, be not interpreted, in any manner whatsoever, to extend the powers of Congress; but that this may be construed either as making exceptions to the specified powers, where this shall be the case or otherwise, as inserted merely for greater caution".

And the Convention enjoined it upon " Their Representatives in Congress, to exert all their influence and use all reasonable and legal methods, to obtain a ratification of the amendments".

Virginia, therefore, when she agreed to the Constitution, understood it in the sense in which it was understood by the other States, viz : as an instrument delegating no powers but those expressed in it, and as one to be construed strictly.

Let us pass to Georgia. We have no evidence of the doings of the Convention of this State, which ratified the Constitution, except, simply, the ratification itself. But we have numerous Acts and Declarations of the State, some of them almost contemporaneous with the ratification, which tell the mind of Georgia, on the subject, more emphatically, if possible, than the mind of any of the other States is told, by the records of their Conventions. These, I shall call to my aid.

The first Act of Georgia, to which I shall refer, will be her denial of jurisdiction to the Supreme Court of the United States, in a case which was brought against her in that Court. It was the case of Chisholm, Ex'r, against Georgia.

" This action was instituted in August Term, 1792. On the 11th of July, 1792, the Marshall, for the District of Georgia, made the following return : " Executed as within commanded ; that is to say, served a copy thereof, on His Excellency, Edward Telfair, Esq. Governor of the State of Georgia, and one other copy on Thomas P. Carnes, Esq. the Attorney General of said State.         ROBERT FORSYTH, Marshall".

Georgia did not appear in the case. The plaintiff then moved, that unless the State, after reasonable notice of that motion, should cause an appearance to be entered for her, or shew cause to the contrary, judgment should be entered against her, and a Writ of Enquiry of Damages be awarded.

Ingersoll and Dallas presented a written remonstrance and protestation, on behalf of the State, against the exercise of jurisdiction in the cause ; but in consequence of *positive instructions*, they declined taking any part in arguing the question. (2 *Dall.* 419.)

It was argued by the Counsel for the plaintiff. The Judges were not unanimous in opinion. The majority, consisting of *Jay, C. J., Wilson, Blair and Cushing,* Justices, held that the Court had jurisdiction. Justice *Iredell*, in a very able opinion, dissented and held that a State could not be sued.

The ground upon which the majority put their decision was, the words of the Constitution—" The Judicial power of the

United States shall extend to controversies between a State, and citizens of another State". The Chief Justice says, " It is contended that this ought to reach none of those controversies, excepting those in which a State may be *plaintiff*". But in answer to that he maintains, first, that the words are to be construed *liberally*, as they are *remedial*. Then he says, "If we attend to the *words*, we find them to be express, positive, free from ambiguity, and without room for such implied expressions" (exceptions.)  (*Ibid*, 476.)

So the Court " *Ordered*, that unless the said State shall either in due form appear, or shew cause to the contrary, in this Court, by the first day of next Term, judgment, by default, shall be entered against the said State". The reporter adds, in a note, that " In February Term, 1794, judgment *was* rendered for the plaintiff, and a Writ of Enquiry awarded. The writ, however, was not sued out and executed ; so that this cause, and all of the other suits against States, were swept, at once, from the records of the Court, by the amendment of the Federal Constitution.  (*Ibid*, 480.)

Georgia treated the Court with contempt, in respect to this case. Her position was, that the Court had no jurisdiction of her as a party. Georgia maintained that the words " The Judicial power of the United States, shall extend to controversies between a State and citizens of another State," were not to be construed to extend to controversies in which a State might be defendant; but only to those in which a State might be plaintiff—why ? obviously because 1. It is not *expressly* said in those words, that the power shall extend to controversies in which a State may be *defendant*, and in the opinion of Georgia, no department of the General Government had any power but such as was *expressly* given it in the Constitution.  2. Because, even if it is, in these words, expressly said that the power shall extend to controversies, in which a State may be defendant, yet these words admit of another and a narrower meaning, namely, one which restricts the power to controversies in which a State may be the *plaintiff*. And they ought to be held to have that meaning, as in the opinion of Georgia even express grants of

power in the Constitution, ought to be construed *with the utmost strictness.*

Georgia, then, in this case, which happened in 1792, three or four years only after the adoption of the Constitution, held that no power was given by the Constitution, but what was expressly given; and that what was expressly givĕn, was to be construed strictly. It is true, this position of her's was taken in reference only to a single power—a Judicial power. But the reasons of the position are general. To be applicable to the particular power in the case, they have to be large enough to be equally applicable to all of the other powers delegated in the Constitution.

Now, in this position, Georgia triumphed. First. The judgment *against* her fell dead. The plaintiff in the case, himself, did not so much as have his Writ of 'Enquiry' executed. He obtained the judgment, by default, in 1794. Nothing more was done in the case until 1798—after the amendment of the Constitution had been made, when this and other similar cases were "swept from the records."

Secondly. This amendment, itself, vindicated the truth of her position. The language of it is peculiar. "The Judicial power of the United States, shall not be *construed* to extend to any suit in Law or Equity, commenced or prosecuted against one of the United States, by citizens of another State, or by citizens or subjects of any foreign State." It is an amendment not to *alter* the Constitution, but to keep it *unaltered.* It is a rebuke to the Supreme Court, for daring to change the Constitution, under pretence of construing it—for daring to hold that the Constitution was not to be *strictly* construed, even in the case of the *remedial* powers which it delegates, and the Judicial powers.

Now this amendment speaks the sense of two-thirds of both branches of Congress, and the sense of the whole people of every State that was in the Union, at the time when it was made, as to the proper construction of the *entire* Constitution. For if a strict construction is the rule as to a Judicial power, which is in its nature remedial, much more is it the rule in ref-

erence to every other power.    It is true that the language of the amendment is not general, but is confined to suits against a State.    And for this, there was a good reason.    The mischief was no broader.    The Supreme Court had made no other false construction than the one as to the power of suing a State.— After the rebuke of that, was it to be presumed that it would ever offend again in a case of construction?

The next act to which I shall refer is the denial, by Georgia, of jurisdiction to the Supreme Court in the cases of *Worcester and Butler vs. Georgia,* to be found reported in 6 *Peters* 515. The question in those cases was, whether an appeal lay from the Superior Courts of Georgia to the Supreme Court of the U S.; whether, in other words, the 25th section of "The Act to establish the Judicial Courts of the United States," passed in 1789, which gives to the Supreme Court of the United States the power of revising and reversing judgments and decrees of State Courts is Constitutional?

In these cases, Worcester and Butler were indicted, convicted and put in the penitentiary, for violating the Laws of Georgia, which forbade white persons to reside within the Cherokee Nation of Indians without permission from the Governor, and without having taken an oath to support and defend the Constitution and Laws of Georgia, and uprightly demean themselves as citizens thereof.    The case occurred in the Superior Court of Gwinnett County.    A writ of error was issued from the Supreme Court of the U. S. on the application of the defendants, to the Judges of the Superior Court, for the county of Gwinnett.    The Clerk of that Court returned a transcript of the cases to the Supreme Court of the U. S.    But the Judge of the Court had nothing to do with this act of the Clerk. He did not recognize the right of the Supreme Court to issue the writ.

The Supreme Court of the U. S., by Marshall C. J., said that it was "too clear for controversy, that the Act of Congress, by which this Court is constituted, has given it the power, and of course imposed on it the duty, of exercising jurisdiction in this case."

Accordingly, that Court took jurisdiction and "adjudged that the judgment rendered in the premises by the said Superior Court of Georgia," whereby the said Samuel A. Worcester is sentenced to hard labor in the penitentiary of Georgia, ought to be reversed and annulled, " and further" [adjudged that said judgment " be and hereby is reversed and annulled" " and that a special mandate do go from this Court to the said Superior Court, to carry this judgment into execution." The judgment was the same in the Butler case.

Now what did Georgia do on receipt of this special mandate? Through every department of her Government she treated the mandate, and the writ of error with contempt the most profound. She did not even protest against jurisdiction as she had done in the case of Chisholm's Ex'r. But she kept Worcester and Butler in the penitentiary, and she executed in the Creek Nation the Laws, for violating which, they had been put in the penitentiary.

And what inference is to be drawn from this course on her part?

In the opinion of the Supreme Court, the cases were too clearly within the 25th section of the Act of 1789 to admit of a doubt as to the jurisdiction of the Court. Yet Georgia said the Court had no jurisdiction. If, then, the cases were within the Act, the only question is, did Congress have power, under the Constitution, to pass the Act? Georgia, by holding that the Court had no jurisdiction, held that Congress had no such power. Now to hold this, what is the rule of construction which she must have considered applicable to the Constitution? The strict rule—the rule which allows the delegation of no power by implication—the rule which restricts words to the narrowest meaning in the cases of expressly delegated powers.

The Constitution says that " The Judicial power shall extend to all cases in Law and Equity arising under this Constitution, the Laws of the United States, and treaties made, and which shall be made, in pursuance thereof," &c. It enumerates other cases. It says, " In all the other cases before mentioned (those affecting

ambassadors being the excepted ones) the Supreme Court shall have *appellate* jurisdiction".

Now it is not mentioned what Courts, whether State or Federal, this appellate jurisdiction is to apply to.   It is not *expressly* said that it is to apply to State Courts.   Therefore, says Georgia, it does not apply to State Courts, and therefore the Act of 1789, as far as it attempts to extend this jurisdiction to State Courts, is unconstitutional and void.

It was not only in this case that Georgia occupied this position—she did it in two other cases, and those cases of life and death—the case of Tassels and that of Graves.   One of these happened before these cases of Worcester and Butler, namely, in 1830, the other afterwards in 1834.   The Supreme Court had issued writs of error in each of these cases on the application of the defendants to the State of Georgia.   But as the cases are not reported, it is to be presumed that these writs never got back to the Supreme Court; or, that if they ever did, it was too late.   It is certain that Georgia hung the applicants for the writ.

In the Tassels case, the Legislature passed these, among other resolutions.

" *Resolved,* That the State of Georgia will never so far compromit her sovereignty, as an independent State, as to become a party to the case sought to be made before the Supreme Court of the United States, by the writ in question.

" *Resolved,* That His Excellency, the Governor, be and he and every other officer of this State, is hereby requested and enjoined to disregard any and every mandate and process that has been, or shall be served on him or them, purporting to proceed from the Chief Justice, or any associate Justice, or the Supreme Court of the United States, for the purpose of arresting the execution of any of the criminal Laws of this State."

The resolutions were signed by Asbury Hull, as Speaker, and by Thomas Stocks, as President, and by George R. Gilmer, as Governor.   (*Pamph. Acts of* 1830, 283.)

Similar resolutions were passed as to the case of Graves by the Legislature of 1834.   These were signed by Thomas Glas-

cock, Speaker; Jacob Wood, President; and Wilson Lumpkin, Governor. (*Acts of* 1834, 338, 9.)

The signers of the first of these two sets of resolutions, belonged to one of the political parties into which the people of Georgia were divided; of the last to the other of those parties. The two sets of resolutions, therefore, are good evidence of what was the unanimous voice of the whole people of the State on the subject.

Georgia, then, also meant the Constitution to be strictly construed, when she agreed to it; and meant it to convey no powers but those expressly mentioned in it.

Of the old thirteen States, which made the Constitution, I have now gone through with all except three, Maryland, Delaware and New Jersey. I have no evidence of the action or sentiments of these States, in the adoption of the Constitution. But it is to be presumed that they had the same view of it which the other ten had; and if they did not, it can make no difference to the argument; for without the help of six, at least, of those ten, these three could not have made the Constitution—even as between themselves. It had to be ratified by at least nine States, before it could become operative.

And what is the result? Does not the evidence conclusively establish the three first of the four propositions, and go far to establish the fourth? I think so.

I am aware that a different doctrine has been laid down by some text writers on the Constitution, and by the Supreme Court of the U. S. I shall briefly notice the doctrine they lay down.

Story, in his Commentaries on the Constitution, 1 vol. sec. 433, says, "In the interpretation of the Constitution, there is no solid objection to *implied powers*". Kent and Serjeant belong to the same school.

And the Supreme Court of the United States, in *McCulloch vs. State of Maryland*, through Ch. J. *Marshall*, say, "Among the enumerated powers, we do not find that of establishing a bank or creating a corporation. But there is no phrase in the instrument which, like the articles of confedera-

tion, excludes *incidental and implied* powers, and which requires that everything granted shall be *expressly* and minutely described.   Even the tenth amendment, which was framed for the purpose of quieting the excessive jealousies which had been excited, omit the word 'expressly', (which was contained in the articles of confederation) and declares only, that the powers not delegated to the U. S., nor prohibited by it to the States are reserved to the States respectively, or to the people.''

It is true, the word 'expressly' is left out of the clause in the amendment to the Constitution.   But it is to be remembered, as we have seen, that the makers of the Constitution— the *State Conventions*—in the making of it—before any amendment to it existed—understood it to convey no powers but expressed powers; and that they were led so to understand it, by the representations of the friends of it—*this very man, Chief Justice Marshall, among them*, and that they agreed to the Constitution in this sense, and this sense only.   It is of no consequence therefore, what this amendment contains or omits in this respect.

I must, however, again quote what Judge Marshall said in the Virginia Convention, when his object was to make the Constitution palatable, and to have it accepted.   He said, "Has the Government of the U. S. power to make laws on every subject?   Does he understand it so"?   "Can they go beyond the delegated powers?   If they were to make a law not warranted by any of the *powers enumerated, it would be considered by the Judges* as an *infringement on the Constitution*, which they are to guard.   They would not consider such a law as coming under their jurisdiction.   *They would declare it void*".   Here is Marshall against Marshall—which is to be taken?   The first: otherwise, the Constitution becomes a stupendous fraud on the States.

But the history of that amendment deserves some notice.— The friends of the Constitution, after they had procured its adoption, were not so anxious to have it amended as they had been to have it adopted.   Nearly every State wanted amend-

ments; and all that wanted them, wanted them on this very point, as to delegated and reserved powers. And the Conventions of Massachusetts, New Hampshire and Virginia instructed their members in Congress to do their best to get an amendment, putting this point beyond question.

Congress was the body that had power to propose amendments. Let us see what it did on the subject of this particular one.

"The 9th proposition in the words following, was considered by House of R.: "The powers not delegated by the Constitution, nor prohibited by it to the States, are reserved to the States respectively". Mr. Tucker moved to insert the word 'expressly' before the word delegated. "Mr. Madison objected to this amendment, because it was impossible to confine a Government to the exercise of express powers—there must necessarily be admitted powers by implication, unless the Constitution descended to count every minutia. He remembered the word expressly had been moved in the Convention of Virginia, by the opponents to the ratification; and after full and fair discussion, was given up by them, and the system allowed to retain its present form". This, and some remarks of Sherman, to the effect that corporate bodies had "All powers incident to a corporate capacity", did the business for 'expressly'.

Mr. Carroll proposed to add, "or to the people". (*Annals of Cong.* 1 *Vol.* 790.) It was done.

Now, as to this statement of Mr. Madison, it is to be observed that the report of the debates, &c., of the Virginia Convention do not confirm it; but in the strongest negative manner affirm what is substantially the contrary of it. They show that the Convention was told by the friends of the Constitution, Madison himself, Nicholas, Randolph, Marshall, that the Constitution would confer on the General Government only express, 'enumerated' powers.

The ratification of Virginia shows the Convention to have had the "impression" that "every power not granted" by the Constitution, "remains" with the people: "that therefore no right", &c., "can be cancelled", &c., "by the Con-

gress", &c., "Except in those *instances* in which power is given by the Constitution, for those purposes."

Now that "*those instances*" mean those *specifications*, those *enumerated cases* "in which power is given", is too clear to admit of a doubt.   It is equally clear, that they were understood in this sense, by the friends of the Constitution; and that they were actually expounded in this sense, by those friends, in order to induce the Convention to choose the form of ratification which contained them, in preference to a form proposed by Patrick Henry.   And that of those friends *so expounding* them, was *Mr. Madison himself.*   Here is the proof.

Two modes of ratification were proposed to the Convention, one by Wythe and one by Henry.   Wythe's contained a preamble to the words of ratification, in which was the declaration, that "The *powers* granted under the proposed Constitution, are the gift of the people; and every power not granted thereby, remains with them and at their will; no right, therefore, of any denomination can be cancelled, &c., by the Congress, &c., except in those instances in which power is given by the Constitution for those purposes", &c.

Wythe's mode was adopted; and it was then "Ordered that a committee be appointed to prepare and report a form of ratification pursuant to that mode."

This was done, and the committee reported a form of ratification, which contained the very words aforesaid, contained in Wythe's preamble.   (3 *Ell. Deb.* 587, 593, 653, 654-5-6.)

Now, in the debate on the two proposed modes, Gov. Randolph said, "What is the paper which he (Henry) offers in the form of a bill of rights?   Will that better secure our rights than a declaration like this? (viz, of Wythe's.)   All rights are therein declared to be completely vested in the people, unless *expressly* given away.   *Can* there be a more pointed or positive reservation"?   So Randolph says the meaning of this declaration is, that all rights are vested in the people, unless *expressly* given away.   (*Id.* 598.)

After Gov. Randolph, on the same side, in reply to one or two intervening speakers on the other side, came Mr. Madison.

He said "With respect to the proposition of the honorable gentleman to my left, (Mr. Wythe) gentlemen apprehend that by enumerating three rights, it implied there were no more.— The observations made by a gentleman lately up, (manifestly Governor Randolph) correspond precisely *with my opinion.*" So Mr. Madison endorses Gov. Randolph as to the meaning of those words. And he adds, "Can the General Government exercise any power not delegated? If an enumeration be made of our rights, (viz: our reserved rights) will it not be *implied* that every thing *omitted* is given to the General Government"? And, to carry out the idea, whereas, if we do not make an enumeration of our reserved rights, but do make one of the delegated rights, it will be *implied* that every right 'omitted' from the enumeration of delegated rights: that is, that every right not enumerated—not *expressed,* is not delegated. (3 *Ell. Deb.* 620.) Of all certain things, none can be more certain than this: that the friends of the Constitution in the Virginia Convention were most anxious to repel the idea that the Constitution would confer powers by *implication.* And power could be conferred on it in but two ways, by implication or by expression.

It is to be hoped, therefore, that Mr. Madison is misreported in the Congressional Annals.

It is to be remembered, too, that at this time Mr. Madison was not the man that he became afterwards. He was the man that a year or two before, in the Convention for drafting the Constitution, used this language : "The States at present are only great corporations, having the power of making by-laws, and these are effectual only, if they are not contradictory to the General Confederation. *The States* OUGHT *to be placed under the control of the General Government—at least as much as they formerly were, under the King and British Parliament*". And it must be admitted that after the adoption of the Constitution, no better way remained to give the General Government this control, than to make a new instrument of the Constitution, by construction. (*Yate's Min.* 1 *Ell. Deb.* 461.)

But there is a word more to be said on this point.

The Convention of Massachusetts accompanied their ratification with the expression of an opinion, that certain amendments would remove fears and guard against an undue administration of the Federal Government; and they, therefore, recommended the adoption of the following amendment, among others :

" 1. That it be *explicitly*, (not left implicitly, as it is now,) declared that all powers, not expressly delegated, are reserved to the several States, (not " or to the people",) to be by them exercised".

And the Convention enjoined it "upon their Representatives in Congress, at all times, until the alterations and provisions aforesaid have been considered, to *exert all their influence, and use all reasonable and legal methods*, to obtain a ratification of the said alterations and provisions".    (1 *Ell. Deb.* 321, 322, 326.)

It will be remembered, too, that this proposed amendment, number one, was stated to the Massachusetts Convention, by John Adams, to be, in itself, equal to a Bill of Rights, and that Fisher Ames and Theodore Sedgewick, were two of the leading friends of the Constitution in that· Convention, and who favored its ratification in that form.

Now, these two gentlemen were also members of the Congress which proposed the amendment under consideration. Did they not " exert all their influence, and use all reasonable and legal methods", to obtain a ratification of the Massachusetts amendment, as they were enjoined by the Massachusetts Convention to do, and as they had personally promised to do, by going for the ratification, in the form in which it stood ? Did they not insist upon having the word " expressly" in ? They did not open their mouths on the subject.    They did not so much as tell the House what was the wish of Massachusetts. They did not ask for the yeas and nays.

But things had changed; the Constitution had become a thing established; before, when the promise was made, it was a

thing to be established; and to establish it was seen to be a work of no small difficulty. Help was needed then.

This Congress went further. It added, at the end of the clause, the words, " or to the people", " reserved to the States or to the people". This addition was called for by no word or deed, of any of the State Conventions. It was put in evidently for future use—to help out a theory of the Constitution— that which assumes for its first principle that the Constitution of the United States was made, not by the peoples of the States, as separate peoples, but by the people of all the States, acting as one people and being one people. That theory, before this little sly addition to the Constitution was made, had no place *inside* the Constitution for its feet to stand on. It had to wait outside, in the preamble.

Instead, then, of proposing amendments of restriction, which the makers of the Constitution wanted, this Congress proposed amendments of enlargement, which those makers did not want. And here, perhaps, we see where entered the first pick in the process of " sapping and mining" the Constitution—a process in which, according to Mr. Jefferson, another department of the Government was to become proficient.

Now, it is true that the omission of the one word, and the addition of the four, are really small matters. They do not change the sense. That, as we have seen, was as full without as with any such amendments, and was so understood to be by the makers of the Constitution, at the time they made it. But then, as to the motives which actuate men, a small thing may tell, as much as a great one. Treachery, infinite, may be exhibited by a mere kiss.

I shall have occasion, again, to advert to the doctrine of the Supreme Court, on the rule of construction of the Constitution. I shall then consider the question, of what authority, over this Court, is a decision of the Supreme Court of the United States. For the present, I shall claim that my first, second and third propositions are established by the evidence. The fourth proposition, viz: " That the words used, if susceptible of more meanings than one, were used in the meaning which was least

favorable to the delegation of power, and most favorable to its retention", will receive some further support. This proposition, more especially, involves the rule which is commonly called the rule of strict construction. That rule, however, is also involved in the other three propositions.

Did, then, the makers of the Constitution intend that the expressed powers should be construed strictly ? That they did, is manifest from a variety of things additional to what have been already brought forward.

1. The people of the States loved their State Governments, and distrusted any Central or General Government. This is a fact as well authenticated as any in history. See Madison, (3 *Ell. Deb.* 258.) They would, therefore, take as little power as possible from these Governments, to give to a Central one. And to diminish the gift as much as possible, it has to be construed strictly.

2. The people of the States who made the Constitution, considered themselves as the sovereign, and the Government as the subject. They were the principal—it the agent. That this is also true, none will dispute.

Now, in a question between principal and agent, the instrument of agency is, as a matter of course, to be construed strictly against the agent. Such construction cannot hurt him. Any other might hurt his principal. The Constitution is but this instrument. Cannot the makers of this, as of all other constitutions, revoke it, even without leave of the agent?

Even the King's grants are to be construed strictly in favor of the King, and against the grantee, he being considered in the systems of Laws which tolerate Kings the Sovereign, and the people the subject. Shall not, therefore, the grant of the people, the real sovereign, to the magistrates, whom they appoint, for their own, and not for those magistrate's purposes, be also construed strictly in their favor, and against the magistrates ?

And if a deed is *without consideration*, it conveys as little as construction can make it convey. There is no consideration

moving from the Government to the States, for the Constitution.

The people, then, who made the Constitution, considering themselves and the Government they made, to occupy this relation towards each other, are to be presumed to have intended the usual incidents of such a relation.    And a strict construction of the instrument of agency, is one of those incidents.

3.  Strict construction of expressed powers results from the fact that no powers but expressed powers are given.    Why were no powers but expressed powers given—because the people did not want to part with power without knowing it—without seeing it with their eyes.    Will you, then, in construing their words, make them say they mean to give more than the least their words require to be given.    It is to be presumed they did not see the larger meaning of which their words are susceptible, otherwise they would have used different words.

The makers of the Constitution enumerated all the powers they gave, even to the power to carry powers into effect.— They did not intend that there should be any opening for implied powers.    They did not leave open the door for the ordinary implication that when the *end* is given expressly, the *means* are given impliedly.    They made a list of powers and said to the Government, you may have these.    They then said here is another power which you shall have, viz: a power to pass any law which may be *necessary and proper*, to carry into effect any of the first named powers.    Now, as to the latter power—the power over means, it is expressly to be taken strictly—it is to be confined to what is *necessary* and *proper*. Is it to be supposed that the men who intended such a construction as to means—the less power should have a different sort of one for ends—the greater power.

4.  Why did they make provision for amending the Constitution ?    Mainly to furnish an easy way to give the Government more power if experience should prove it to need more.    It is easy to give power—hard to get it back—knowing this, is it not to be supposed that the makers of the Constitution intended their grants of power to be taken strictly ?

5. But if any thing could prove that the rule of strict construction was the rule intended by the makers of the Constitution, it would be the amendment of the Constitution as *to construction*. That amendment is, that "The Judicial power shall not be *construed* to extend to any suit, as against one of the United States, by citizens of another State, or by citizens or subjects of any foreign State"?

Now here is a construction which the makers of the instrument themselves put upon their own work in respect to one most important power. The words to be construed were these: "The Judicial power shall extend" "to controversies" "between a State and citizens of another State" "and between a State or the citizens thereof, and foreign States, citizens or subjects". The Supreme Court of the United States, in the case of Chisholm, Executor *vs.* Georgia, had held that the former of these grants authorized a State to be sued as defendant. That Court maintained that the words themselves plainly said that the State might be sued—as plainly as they said "a citizen" might be. But two-thirds of both branches of Congress, and the entire people of all the States said no. They said that even such words should not be so construed. They said that the words were susceptible of a narrower meaning, one in *favor of the States*—a meaning which would let States sue, but not be sued; and that, therefore, the words should be *construed* to have that meaning. This was all said and done soon after the making of the Constitution—from 1793 to 1798—when the whole idea of the Constitution was fresh in the minds of them —its makers. This was a remedial power too. Yet as against *the States* even, it must give up its prerogative, and be construed strictly.

Now if in such a case the makers of the Constitution, trampling the Supreme Court under their feet in favor of the States, say the strict rule shall prevail, in what possible case could they say it should not prevail? Was it to be presumed that after such a rebuke from the makers of the Constitution, the Supreme Court or any branch of the Government would ever give occasion for another, by committing a similar offence

against construction. Certainly not. Hence the amendment is not made larger than the mischief. But it shows, unmistakably, the idea of the makers of the Constitution, as to the *rule of its construction.* It shows they intended it to be construed with the *utmost strictness* possible, *in favor of the States.*

6. But the makers of the Constitution were deceived. Congress and the Supreme Court, notwithstanding this rebuke, went on in their old course of construction. They found a warrant in the Constitution for Jay's treaty; for the alien act; for the sedition act. So the makers of the Constitution thought they would try another remedy than amendment of that instrument. They concluded to smite the construers. This they did. Wherever they could reach an offender, they hurled him against the ground, and put their foot on him, and kept him there till he died or repented. The Supreme Court offenders were beyond their reach. They had in their offices a tenure for life; and as all the offenders in this case were such as not to be affected by any thing but *punishment,* those who could not be punished contemned their courses. But the other departments of the Government underwent a change. They construed the Constitution according to the Virginia and Kentucky Resolutions of 1798 and 1799. These prescribed the strict rule. This was the rule of Jefferson and the Republican party. This was the rule that put down the Federal party which had had possession of the Government from its origin under the Constitution. The offence of that party was that, in the opinion of the makers of the Constitution, the people of the States had put a false construction on that instrument. Hence it was hurled from power—from *respectability.* Its name became a word of reproach. This great revolution in government was made for the sake of a rule of construing the Constitution—this same strict rule. And from the year 1800, 1801, when the revolution took place, no party has *professed* any other rule, although it must be admitted that the practice of parties has not, in this respect, always corresponded with their professions. The voice of the makers of the Constitution then —the people of the States—by this amendment of the Consti-

tution, and by this condemnation of the early administrators of it, proclaims the strict rule.

7. And the practice of all of the States, from the date of the Constitution, 'til this day, proves the States to believe that rule to be the true one. All have passed Laws upon the idea that they retained all powers which a strict construction of the Constitution would not give to the General Government. The Passenger Laws of New York and Massachusetts illustrate this. These two great States thought their respective laws on this subject to be warranted by the Constitution. This was the opinion of *every* branch of the Governments of each of those States. This was the opinion of four Judges of the Supreme Court of the United States. And doubtless this was the opinion of the Congress and the President of the United States: for neither of those departments made any complaint of those Laws; and they were Laws which infringed the rights of those departments, if they infringed any rights, for they touched commerce, if they touched any thing committed to any department; and that is committed to Congress. And is it not certain that this was the opinion of all the other States and State Governments? But against all this weight of opinion in favor of the constitutionality of these laws, we had Mr. Justice McLeon, Mr. Justice Wayne, Mr. Justice Catron, Mr. Justice Grier, and Mr. Justice McKinley.

But the question for the present is, not what the Supreme Court consider the rule of construction to be, or whether what they consider it to be is to be conclusive upon the rest of the world, but it is, what was the sense in which the makers of the Constitution understood it, at the time when they made it. And I now insist that I have established all of my four propositions on that subject, viz:

[6.] 1. The makers of the Constitution understood that it "Delegated to the General Government, or any department thereof, no power by *implication*, but only delegated such powers as it *expressly enumerated.*

2. That it delegated no exclusive power, unless the delegation was *said* to be exclusive.

3. That it laid no prohibition upon the States, except such as it specified.

4. That the words used in it, if susceptible of more meanings than one, were used in the meaning which was least favorable to the delegation of power, and most favorable to its retention.

I have assumed that the Constitution is to be construed in the sense in which its makers understood it when they made it. Who will dispute this?

In what sense did those makers understand it? I have endeavored to show. Have I succeeded? What is there against my conclusions? Nothing, except some decisions of the Supreme Court of the United States. Are not these decisions, *per se*, evidence of what was the sense which the makers of the Constitution had, of the meaning of that instrument? I say by no means. What that sense was, is a question of *fact*, which has to be solved by going into the domain of facts—the domain in which I have been laboring so long. It is a question which *evidence*, not *ipse dixit*, must determine.

And I say, further, that the rule of construction of the Supreme Court, as it is to be deduced from the decisions of that Court, is one which needs only to be read in its consequences, to satisfy everybody that it could not have been the rule of the makers of the instrument. Is this so? Let us take one of its most celebrated decisions—the decision in *McCulloch vs. Maryland*, and see. (4 *Wheat.*)

Maryland made a Law, imposing a tax on "All banks or branches thereof, in the State of Maryland, not chartered by the Legislature". The branch of the United States Bank, at Baltimore, refused to pay this tax—the Cashier of it was sued for the tax by the State, and the suit was finally carried up to the Supreme Court of the United States.

That Court decided, first, that Congress had power to make a bank. Secondly, that the States had not power to tax the branches of such a bank, established within their territory. In order to arrive at these conclusions, the Court had to have very large premises. Accordingly, to support the first conclu-

sion, it pronounced the rule of construing the clause of the Constitution which gives Congress power to pass all Laws which may be necessary and proper, for carrying into execution the enumerated powers, to be this: "The result of the most careful and attentive consideration bestowed upon this clause is, that if it does not enlarge, it cannot be construed to restrain, the powers of Congress, or to impair the right of the Legislature to exercise its best judgment in the selection of measures to carry into execution the Constitutional powers of the Government".

This means that among measures for executing "the Constitutional powers of Government", Congress may, at discretion, choose one as well as another. And this is giving Congress power to make a dictator.

The appointment of a dictator would be a measure by which all the powers of the Government could be executed most promptly and most efficiently. It is by far the simplest of all modes.

The argument will stand thus: Congress has power to select any measure for executing the Constitutional powers of the Government.

The appointment of a dictator would be a prompt, efficient and simple measure to execute any of its powers.

Therefore, Congress has power to appoint a dictator.

The premises are amply large enough to hold this conclusion.

To support the second conclusion, the Court lays down this proposition: "We find, then, on just theory, a total failure of this original right to tax the means employed by the Government of the Union, for the execution of its powers". And this—"That the power to tax involves the power to destroy". And these—"If we apply the principle for which the State of Maryland contends, to the Constitution, generally, we shall find it capable of changing, totally, the character of that instrument. We shall find it capable of arresting all the measures of the Government, and of prostrating it at the foot of the States. If the States may tax one instrument employed by

the Government, in the execution of its powers, they may tax any and every other. They may tax the mail; they may tax the mint; they may tax all the means employed by the Government, to an excess which would defeat all the ends of Government—this was not intended by the American people".

Now the principle at the bottom of all these propositions is this: The States have no power, by the exercise of which, they can defeat all the ends of Government—the General Government, or any of those ends.

But the States, by the exercise of the taxing power, can take from their inhabitants every cent the inhabitants can spare, and live.

According to the principle of this decision, therefore, the States have no power to lay any tax on their inhabitants; and if they have no power to tax, it follows that they have no power to enable them to keep up their State Governments; and without State Governments, they have no power to keep themselves alive, as States.

The principle comes to this: that the States, in making the Constitution, intended to give up the power of self-preservation.

On the one hand, then, Congress may convert the General Government into a dictator; on the other, the States have not retained the power of self-preservation. This is *McCulloch vs. Maryland*. It is to this that the Supreme Court rule leads. Did the makers of the Constitution intend any *such* rule as this?

But this case is evidence in another point of view. It shows that the Supreme Court of the United States, in construing the Constitution, not only do not seek for the meaning of the makers of it, but that when they have that meaning, unmistakably, without seeking for it, they disregard it. They decide, here, that Congress may charter a corporation. Now the power " To grant charters of incorporation, where the interest of the United States might require, and the Legislative provisions of the several States may be incompetent", was asked to be given to Congress, in the Convention which framed the Con-

stitution.   There being much objection to the breadth of this power, as asked for, and some indications of favor to a  power, merely to incorporate canals, the motion was so modified as  to admit a distinct question, specifying and limited to the case  of canals.   It was rejected by eight States  to  three ; and " The other part", says Mr. Madison,  " fell, of course, as *including* the *power rejected*".   The Convention, then, refused the power to incorporate so much  as a canal ;  and, in the face of  this refusal, the Supreme  Court  of the  United  States say,  they gave power to incorporate a bank,  with a capital of  $35,000,-000, and authority to establish branches in every State.   What matters it to such a Court, what was the wish of the makers of the Constitution ?   (5 *Ell. Deb.* 543, '4.)

The disregard of this Court to the known will of the makers of the Constitution, as to  the rule of  construction, is  equally exhibited in a number of other cases ; especially in the  cases of *Cohen vs.  Virginia* and *Worcester & Butler vs.  Georgia,* in which it held  that a  State might be sued,  notwithstanding the clear manifestation of the will of the makers of the Constitution, in the  amendment of it; to which I have  heretofore referred, that the Constitution  was not to be  so construed as  to make a State sueable.

But are not the decisions of the Supreme Court of the  United States to govern this Court, as to the rule  of  construing the Constitution ?   They are not, any more than the decisions of that Court are to be governed by the decisions of this.

The Supreme Court of the United States has no jurisdiction over this Court, or over any department of the Government of Georgia.    This Court is not a United States Court; and therefore, neither the Government of the United States, nor any department of it, can give this Court an order.   It follows, if this be true, that  decisions of that Court, are  not  precedents for this Court.

Is this true ?   Let us see.    And first,  let us  try the questions by the principles of the party of liberal construction, as promulged by their most distinguished leaders.

That party held, at the time the Constitution was in the pro-

cess of adoption, as well as afterwards, that the State Governments were " supreme" and " sovereign," as to some things, and that the General Government was " supreme" and " sovereign", as to some. Alexander Hamilton, as we have seen, when insisting on the adoption of the Constitution in the New York Convention, said, " That two supremes cannot act together, is false. They are inconsistent, only when they are aimed at each other, or at one indivisible object. The Laws of the United States are supreme, as to all their proper Constitutional objects; *the Laws of the States are supreme in the same way.* The meaning of the maxim—there cannot be two supremes, is simply this: two powers cannot be supreme over each other". (2 *Ell. Deb.* 356.) Again, a day or two after, he said, " I maintain that the word *supreme,* imports no more than this: that the Constitution and Laws made in pursuance thereof, cannot be controlled or defeated by any other Law. The Acts of the United States, therefore, will be absolutely obligatory, as to all the proper objects and powers of the General Government; but the Laws of Congress are restricted to a certain sphere; and when they depart from this sphere, they are no longer supreme or binding. In the same manner, the States have certain independent powers, in which their Laws are *supreme.* For example, in making and executing Laws concerning the punishment of certain crimes, such as murder, theft, &c. the *States cannot be controlled. With respect to certain other objects, the powers of the two Governments are* CONCURRENT, *and yet supreme.* I instanced, yesterday, a *tax* on a specific article. Both might lay the tax—both might collect it, without clashing or interference. If the individual should be unable to pay both, the *first* seizure would hold the property. Here, the Laws are not in the way of each other—they are *independent and supreme*".

The idea meant to be conveyed here is clearly this: that the General Government has a sphere in which it is supreme, and the State Governments a sphere in which they are supreme; that these spheres intersect each other, and that the space included between the arcs of intersection, is common to both—is a

space in which both are *equally supreme*, and in which there is no rule but one—*Qui prior est in tempore potior est in jure.*

The same principles have been expressed by *Marshall*, Chief Justice, since the adoption of the Constitution.   In *McCulloch vs. Maryland*, he says, " In America, the powers of sovereignty are *divided between* the Government of the Union, and those of the States.   They are *each sovereign*, with respect to the objects committed to it, and neither sovereign, with respect to the objects committed to the other".   (4 *Wheat.* 410.)

Now, if the General Government, by its Judiciary, can come out of its sphere, into the sphere of a State Government, and ravish a case thence out of the hands of the State Judiciary, the two Governments are not equally supreme within their respective spheres.   But they are, by admission of Hamilton and Marshall, equally supreme in their respective spheres; therefore, the former Government cannot do this, with respect to the latter.   As well might it be said that England could order a case out of France, from a French into an English Court; or that a State Court could order a case out of the Supreme Court of the United States into it.   None but a superior can give an order; none but an inferior is bound to obey one.

The question, when tried by the rule of strict construction, does not admit of a doubt.   That rule is, that the General Government has no powers, except such as have been *expressly* delegated to it; and that the delegations of express power are to be strictly construed.

Now, jurisdiction over State Courts is not *expressly* given to the General Government, or any department of it.

Therefore, according to this rule, such jurisdiction is not given at all.

Not only is this sort of jurisdiction not expressly given; but there is another sort expressly given, which *necessarily* excludes the idea that this was intended to be given.   That is done in the third article for organizing the judiciary.   This will appear by simply inserting in that article the words which are neces-

sarily implied. Let us do this. The section will then read as follows, the supplied words being in brackets:

" The (whole) judicial power (except as herein excepted) of the United States, shall be vested in one Supreme Court, and in such Inferior Courts as the Congress may, from time to time, ordain and establish. The Judges, both of the Supreme and Inferior Courts, (who are to exercise this whole judicial power, except as herein excepted) shall hold their offices during good behavior; and shall, at stated times, receive for their services a compensation which shall not be diminished during their continuance in office.

The (whole) judicial power (except as before excepted) (thus vested in one Supreme Court and in such Inferior Courts as the Congress may, from time to time establish, to be exercised by Judges who are to hold their offices during good behavior) shall extend to all cases in Law and Equity, arising under this Constitution, the Laws of the United States, and treaties made, or which shall be made under their authority, to all cases affecting Ambassadors, other public Ministers and Consuls; to all cases of admiralty and maritime jurisdiction; to controversies to which the United States shall be a party; to controversies between two or more States; between a State and citizens of another State; between citizens of different States; between citizens of the same State, claiming lands under grants of different States; and between a State or the citizens thereof, and foreign States, citizens or subjects".

" In all (those) cases affecting ambassadors, other public ministers and consuls, and those in which a State shall be a party, (in respect to which the whole judicial power of the U. S. is thus vested in one Supreme Court, and in such Inferior Courts as the Congress may, from time to time ordain and establish with Judges for life,) the Supreme Court shall have original jurisdiction. In all the other cases before mentioned, (in respect to which the whole judicial power of the U. S. is thus vested in one Supreme Court, and in such Inferior Courts as the Congress may, from time to time ordain and establish, with Judges for life,) the Supreme Court shall have appellate

jurisdiction, (*as to such Inferior Courts*) both as to Law and fact, with such exceptions, and under such regulations, as the Congress shall make, (and such Inferior Courts shall, as to these other cases, have *original* jurisdiction as to such Supreme Court.)

The mere supply of these necessarily understood words, makes it as clear as day, that the *appellate jurisdiction* delegated to the Supreme Court, applies only *to the Inferior Courts of the United States*, ordained and established by Congress, *with Judges for life*, and not to State Courts, which are not United States Courts, which are not ordained and established by Congress, and which are presided over by Judges who do not hold their offices for life.

Now in this part of the article is contained the *whole* judicial power delegated to the General Government, except as to impeachments; and as to the powers of the two houses to judge of the elections, &c., of their members.

What, then, is thus expressly laid down in the Constitution, necessarily excludes the idea that the General Government, or any department of it, was to have jurisdiction over the Courts of a State.

But again : if this sort of appellate jurisdiction exists, then it exists equally with respect to a State Court of one grade, as to a State Court of another.   It exists as to all Courts 'inferior' to the Supreme Court ; and if the highest State Courts are inferior to that Court, still more so are the less high.   If this sort of jurisdiction exists, then there may, as far as this State is concerned, be an appeal to the Supreme Court of the U. S., from the Supreme Court of the State, from the Inferior Courts, from the Ordinary, from the Justice's Courts, from Corporation Courts, and perhaps from Court's Martial.   This appellate jurisdiction, then, if it exists, extends to every State Court alike.

And the same sort of construction which makes it to exist at all, as to any State *Court*, will much more easily make it extend to every *case* that can arise in any such Court.   The cases to which it is to extend, as mentioned by the Constitution, are " All cases in Law and Equity, arising under this

Constitution, the Laws of the United States, and treaties made, or which shall be made under their authority" and others. But these are enough. What are cases "arising under the Constitution"? Under the *liberal rule* of construction, it is easy to say that the Constitution is an instrument which gives one part of the powers of Government to the General Government; and gives the other part to the States—that *all* power is given by the Constitution. Now if that be said, no case of any kind can arise in a State which will not draw in question some power of the State, or some power of the General Government; but if a case draws in question a power of either, it is a case arising under the Constitution; because, on on this theory, the powers of both are derived from the Constitution.

This appellate jurisdiction, if it exists then, extends to all State Courts of all grades, and to all cases in those Courts.— The effect of such extension, would be to make the States exist, at the mercy of the General Government. If they laid a tax, the taxed person might refuse to pay it; and if sued for it, appeal to the Supreme Court. That Court could pronounce the tax law unconstitutional; as flowing from a power which, if it existed in the States, might enable the States to destroy the General Government, by taking to themselves all that could be paid for taxes, and leaving nothing for the General Government to take. The Court would so pronounce, if it should follow the principle on which *McCulloch vs. Maryland* stands. This is but an instance out of a thousand.

Now the power to annul State Laws was not given to the General Government. The Federal Convention *refused* repeatedly to give this power to any department of the General Government.

In Mr. Randolph's propositions, which were the basis of the Constitution, the effort to give this power first appears. His 6th resolution had these words, "*Resolved*, that *each* branch (of the Legislature) ought to possess the right to negative all laws passed by the several States, contravening, in the opin-

ion of the National Legislature, the articles of union ; or any treaty subsisting under the authority of the United States".

His 8th, these : " That the Executive, and a convenient number of the National Judiciary, ought to compose a council of revision, with authority to examine every act of the National Legislature, before it shall operate ; and every act of a particular Legislature, before a negative thereon shall be final ; and that the dissent of the said council shall amount to a rejection, unless the Act of the National Legislature be again passed, or that of a particular Legislature be again negatived by —––— of the members of each branch". (5 *Ell. Deb.* 127-8.)

Here the *Judiciary* was to take part in the veto of State Laws. It might, with the President, *affirm* a veto applied by either branch of Congress to a State Law. But even this limited right was not allowed to the *Judiciary*. It was struck from the resolution, and at once. (*Ib.* 166.) And although asked for repeatedly afterwards, by the enemies of the States, in the Convention, it was pertinaciously refused. The Judiciary was refused the power to participate in any revision or negative of any Laws, whether State or Federal. (See *Ib.* 344, 428.)

So the power proposed to be given to the Federal Legislature, " To negative all laws passed by the several States, contravening in the opinion of the National Legislature, the articles of Union", &c., was refused by the vote of seven States to three. (*Ib.* 321, 322.) Even Gouverneur Morris " opposed this power as likely to be terrible to the States, and not necessary, if sufficient power should be given to the General Government". (*Ib.*)

Indeed, members of the Convention, Mercer, and Dickinson, and Sherman, expressed decided opinions against the propriety of the doctrine, that " The Judges, as expositors of the Constitution, should have authority to declare a Law void" ; and these opinions were feebly combatted. (*Ib.* 429.)

It appears, then, that the Convention which drafted the Constitution, although repeatedly requested to give the veto of. State Laws to the General Government, steadily refused it

—refused to give a mere modicum of it to the Judiciary.— And if it refused to give the power directly, it is not to be presumed that it gave it indirectly, by a forced implication in the said third article—gave it, indeed, without knowing what it was doing.

Now it must be manifest to any one, on a little reflection, that if the United States' Courts have power over the State *Courts,* they have power over the State *Laws*—power over the operation of those Laws, within the territory of the States— power *to nullify every Act of the States.* Was this the intention of the makers of the Constitution—these very States?

[7.] The conclusion is, that the Supreme Court of Georgia is co-equal and co-ordinate with the Supreme Court of the United States, and not inferior and subordinate to that Court. That as to the reserved powers, the State Court is supreme; that as to the delegated powers, the U. S. Court is supreme; that as to powers, both delegated and reserved—*concurrent powers*—both Courts, in the language of Hamilton, are " equally supreme"; and that as a consequence, the Supreme Court of the United States has no jurisdiction over the Supreme Court of Georgia; and cannot, therefore, give it an order, or make for it a *precedent.*

This conclusion is in accordance with the uniform action of the Government of Georgia, in all of its departments. In the cases of the missionaries, Worcester and Butler; of Tassells, and of Graves, her Courts treated, with contempt, the claim of jurisdiction over them, by the Supreme Court of the United States. The missionaries served their times out in the penitentiary, notwithstanding the mandate of the Supreme Court of the United States, that they should be set at liberty. In this course, on the part of the Judiciary, the Legislature and the Executive concurred—indeed, co-operated. And the people approved the conduct of the whole.

Now it is true, these were criminal cases; but that can make no difference. If the United States' Court has no jurisdiction over the State Court, with respect to a criminal case, involving Statutes of the United States, and treaties with the Indians, as

these cases did, it can have none over the State Court, with respect to a civil case.   A civil case can do no more towards giving jurisdiction than involve some Statute, or treaty, or the Constitution.

I am aware that Congress have passed two Acts contravening this view.   The Act of 1789, to establish the Judicial Courts of the United States, and the Act of 1833, further to provide for the collection of duties on imports".   (*Story's Laws*, 1 *vol.* 53, 4 *do.* 2340.)

The first, in its 25th section, declares, among other things, " That a final judgment or decree, in any suit in the highest Court of Law or Equity, of a State, in which a decision in the suit could be had, where is drawn in question the validity of a treaty or Statute of, or an authority exercised under the United States, and the decision is against their validity", &c. enumerating other cases, " may be re-examined and reversed or affirmed in the Supreme Court of the United States, upon a Writ of Error", &c.

The Act of 1833 declares that in any case, where suit or prosecution shall be commenced in a Court of any State, against any officer of the United States or other person, for or on account of any Act done under the Revenue Laws of the United States, &c. " it shall be lawful for the defendant, at any time before trial", upon petition, to transfer his case into the *Circuit* Court of the United States ; "And it shall be the duty of the Clerk of the Circuit Court, to issue a Writ of Certiorari to the State Court, requiring said State Court to send to said Circuit, the record and proceedings in the cause".

The men that made this Act, did not have the effrontery to make it to last longer than the " end of the next Session of Congress".

This Act makes the Circuit Courts—the inferior Courts of the United States, superior to the highest State Courts.   And, in truth, there is as much warrant in the Constitution, for making these inferior Courts so, as for making the Supreme Court so.

If the Constitution does not give the General Government,

or any department of it, jurisdiction over the Judiciary of the States, it does not give Congress the power to pass such Laws as these; and these Laws are therefore void.

My opinion is, that the Constitution does not, and I have given my reasons for the opinion.

But say that I am wrong in this opinion; still, I deny that the decisions of the Supreme Court referred to, are precedents to govern this Court.

Those decisions were mere partisan decisions—to be overruled in the Court which made them, as soon as a majority of the members of the Court should be of different politics from the politics of the members who made the decisions. The doctrine that a decision of the Supreme Court of the United States is to dictate a man's politics to him, is a doctrine avowed by few in this country. Such a doctrine would be an easy means of perpetuating a dynasty of principles, however false or wicked. All that would have to be done, would be to start with men of those principles. Their decisions would do the rest. Whatever they said the Constitution meant, the people would have to vote it to mean. Parties, on Constitutional questions, could not arise.

But are these mere political decisions, and made by partisan Judges?

There are now, and have been before now, in these United States, but two parties, with a deeply marked line of separation between them. The party which stands on the side of the delegated powers, and that which stands on the side of the reserved powers—the National party and the State's Rights party.

Now, the effect of the decisions of the Supreme Court, to which I have referred, is to put up the National party and to put down the State's Rights party. The decisions are, therefore, political. Indeed, they discuss the same topics and come to the same results, in all respects, as do the speakers in Congress, the stump orators out of Congress, and the newspaper writers in and out of it—of the same politics as the majority of the Court making the decisions.

Are the Judges partisans ?   What are their  antecedents ?
The leading Judges on the bench of the Supreme Court, before
the era of Judge Marshall, were Jay,  Wilson and Ellsworth ?
Each of these had been an active and an ardent politician before
he went upon the bench.    He had acquired his bend in politics.
On the bench, he only  uttered the same  Constitutional doc-
trines which he had uttered off.

In the  era of Judge Marshall, which lasted through  thirty-
four years, he was the Chief of the Court, and Justice Story
was a good second.   Was Judge Marshall a politician ?   Let
this summary of his life, taken from his biography, in the *Na-
tional Portrait Gallery*, answer :

Born  in 1755, he was a  Lieutenant in 1775 ; a  first Lieu-
tenant in 1776 ;  a Captain in 1777, 1779 and 1780.    He read
Law in 1780.   After Cornwallis's surrender, the Courts being
again opened, he commenced practice.   In 1782, he was elect-
ed to the Legislature of Virginia ; in the same year, was made
a member of the Executive Council.   In 1784, he resigned his
seat in the Council.   Immediately afterwards, he was again
elected to the Legislature.   In 1787, he was elected from Hen-
rico.   In 1788, he was a member of the Virginia Convention
for ratifying the Constitution.   In the same year, he was elect-
ed to the Legislature.   " With considerable reluctance, he
yielded to the  public wishes, being principally influenced, in
his acceptance of the station, by the increasing hostility mani-
fested in the State, against the National Government, and his
own  anxious desire to give the latter his  decided and  public
support".   He continued a member for Richmond during 1789,
1790 and 1791.   Then he retired from politics.   He was
again drawn forth by the French question.   Here, " the deci-
ded part taken by Mr. Marshall, could not long  remain unno-
ticed.   He was attacked with great asperity, in the newspa-
pers and pamphlets of the day, and designated, by way of sig-
nificant reproach, as the co-adjutor and friend of Alexander
Hamilton".   In 1795, he was elected to the Legislature, in
which body he signalized himself by the defence of Jay's trea-
ty, the great political question of the day.   In consequence, he

was offered, by the President, the place of Attorney General; solicited to go Minister to France, but declined both offers. Within a year, he was offered this place of Minister, by the next President, Adams. This time he accepted, went abroad and returned in 1798. The next year, after an "ardent contest", he was elected to Congress. He took his seat in December, 1799; distinguished himself in the "ever memorable" Congress of 1799, 1800, and in May, 1800, was made Secretary of War, and soon afterwards, Secretary of State. In 1799, while a candidate for Congress, he was offered a place on the bench of the Supreme Court of the United States; but this he then refused, preferring, no doubt, the more dazzling honors of the mere politician. A year afterwards, he thought better of the Judgship. It was offered him again, and on the 31st of January, 1801, he took it—became Chief Justice. By this time, it was seen that his party was struck with death, and that, therefore, further political offices were hopeless. Whilst upon the bench, he lost no occasion to inculcate his politics. Hence, the number of his elaborate *obiter dicta* discourses. As in *Marbury vs. Madison*, where, although admitting his Court had no jurisdiction in the case, he argued at length, to show what was the Law of it, and what the Court would do, if it had jurisdiction, namely : issue a mandamus to a co-ordinate department of the Government, the Secretary of State, requiring that department to commission to office certain of his party friends, who had been appointed to office at midnight of the night when the appointing power itself, John Adams, went out of office. As in *Cohens against The State of Virginia*, a case in which his Court decides that it has no jurisdiction upon the merits; and yet, in a motion, not on the merits, he lays down the doctrine that a State may be sued, and sued by one of its own citizens, in the Supreme Court of the United States, notwithstanding he, himself, had told the Convention of that very Virginia, when persuading it to adopt the Constitution, that a State could not be sued, and was not intended to be sued, by virtue of the Judiciary article of the Constitution.

His language to the Convention is most unequivocal. He

said, "*I hope that no gentlemen will think that a State will be called at the bar of the Federal Court.*    It is not rational to suppose that *the Sovereign power should be dragged before a Court.    The intent is, to enable States to recover claims of individuals residing in other States.    I contend this construction is warranted by the words.*    But, say they, there will be partiality in it, if a State cannot be defendant; if an individual cannot proceed to obtain judgment against a State, though he may be sued by a State.    *It is necessary to be so, and cannot be avoided*".    It is *charity* to set down these opposite representations of the meaning of the Constitution, to the inconsistencies of the mere politician.

It was not only on the bench that he taught politics. He entered the fields of history and biography for the same purpose.    For what is his Life of Washington and History of the Colonies, but a labored defence of his party, and an effort to raise its desperate fortunes, by forcing the name of Washington on the list of its patrons.    No; it was not the death of Washington, but the death of the Federal Party, that set that work on foot.    This is but thinly disguised, in the preface of the work.    He says, "Deep impressions were then made, respecting the subjects themselves, and the persons by whom the various important propositions, then discussed, were supported or opposed, which are not yet entirely effaced.    Justice to the patriot statesmen, who then devoted their time and talent to the public service, requires that the reasons on which they acted should be known".    Marshall, then, was a partisan, if there was ever one.    Whilst thus a partisan, holding all the opinions of his party, he is, by a party-President, in the last hour of the party, when its death-warrant has already been signed, to save him from the general doom, and as the only reward left for party services, Presidencies being out of the question, offered a Judgship.    This time he accepts it, although he had refused it a year before, when it had not become apparent that the last hour of the party was at hand, and when, therefore, higher offices might not be looked for, from it, than that of Judge.    What was the course for any partisan to pursue, under such circum-

stances? That which he pursued. He took sanctuary, for life, in the Supreme Court. But there he was the same man that he had been before he got there. The only effect was, to make him more bold in the avowal of his old principles. He no longer had to answer for them at the ballot-box. He and his Court, with respect to the Constitution, took one road—the other departments of the Government, and the vast majority of the American people, took another. There they have been respectively travelling, the greater part of the time since. The opinions of neither have had the least influence upon the action of the other. As to Judge Story, he is understood to have distinguished himself, somewhat, as a *Republican* partisan, before the war of 1812, in Massachusetts, where Republicans were then rather scarce. Being a young lawyer of some promise, and about the only lawyer of that party, there, of much note, he was selected, by Mr. Madison, for the bench of the Supreme Court of the United States. But once on the bench, he forsook his party and became the humble interpreter of Marshall—the Dumont to Bentham. He made it his business to illustrate and to embody the political doctrines of his chief. And this he did, in what he styles his " Commentaries on the Constitution". This is a work of as rank a partisan character, on one side, as the Virginia and Kentucky Resolutions, and Mr. Madison's Report of 1798 and 1799, are on the other. Indeed, these Commentaries, and most, if not all of Marshall's Constitutional decisions, are only so much talk at those resolutions and that report, although the resolutions and report are seldom mentioned.

Now, partisan decisions may do to bind the political party, which the makers of them happen to belong to. They certainly bind no other party. And this has been the uniform opinion and practice of all parties in this country. The Supreme Court said a bank is Constitutional; yet, bank charters have been vetoed by three several Presidents: Madison—Jackson—Tyler.

So, when a person has been put on the bench of the Supreme Court, who has different politics from those which justi-

fied any particular decision, he goes according to his own politics, and not according to the decision. He dissents, if need be, as was done in the Passenger Cases. He decides Constitutional questions as *he* understands them.

And partisan decisions—and all decisions on Constitutional questions, must be more or less partisan—*ought* not to bind as precedents, because they are not made by the tribunal which, in the last resort, is supreme. This tribunal is the people of the States—the authors of the Constitution.

[8.] The general conclusion is, that what was before laid down as to the sense in which the makers of the Constitution understood the Constitution, when they made it, is true, any thing in any decision of the Supreme Court of the United States to the contrary, notwithstanding. It remains only, therefore, to make an application of what was thus laid down to the matters in hand, viz: to the case of *Brown vs. Maryland,* to see whether it overrules that case, and to the case of Padelford Fay & Co. before this Court, to see how it requires that case to be decided.

But what was laid down? Let us repeat it.

The makers of the Constitution, at the time when they made it, understood it in this sense:

1. That it delegated to the General Government, or any department thereof, no power by *implication*, but only delegated such powers as it *expressly enumerated*.

2. That it delegated no exclusive power, unless the delegation was *said* to be exclusive.

3. That it laid no prohibition on the States, except such as it specified.

4. That the words used in it, if susceptible of more meanings than one, were used in the meaning which was least favorable to the delegation of power and most favorable to its retention.

These propositions convey the sense in which the makers of the Constitution understood it, at the time when they made it. The sense of the makers is to govern. These propositions then become the rules of construing the Constitution.

[9.] Tried by these rules, the decision in *Brown vs. Maryland* will be easily found to be unconstitutional. But the length to which this opinion has already been drawn out, forbids me to make the application of the rules to that case. It is sufficient that I confine myself to the application of them to the case for the decision of this Court. That I shall now endeavor to do.

[10.] According to these rules, therefore, does the Ordinance of Savannah interfere with the clause of the Constitution, which says that Congress shall have "power to regulate commerce with foreign nations and among the several States"? The answer is that it does not.

1. The power to regulate commerce, given to Congress, is not *said* to be exclusive. Therefore it is not exclusive. The States and Congress have it *concurrently*.

2. So a tax on "sales" is not a tax on *commerce*—not a *regulation* of commerce. Sales are not commerce. Commerce is traffic—is an *act*—is the *act* of buying and selling—and not the result of the act—not the thing bought or the thing that stands in the place of the thing sold—the price—the "sales".

It is true, the liberal rule of construction makes commerce mean "intercourse" and mean "navigation"—but the word has no such meaning by dictionaries; by the Common Law; or by common usage. And if this rule allows you to step beyond the meaning of the word thus defined, to "intercourse" and to "navigation" it may perhaps equally allow you to step to "sales". The strict rule, however, allows nothing of the kind. It requires words susceptible of more meanings than one, to be taken in that which must favor the States.

3. Then these "sales" if commerce at all, are not commerce "*with foreign nations*," or "*among the States*". If commerce at all, they must be held under the rules we are now applying, to be *internal commerce*—the commerce that takes place entirely inside of a State. They are the result of a whole year's business within the limits of the State.

4. This ordinance is a *tax* Law—not a commercial Law. If it interferes with any power of Congress, it must, under these

rules, be with the *taxing* power.    But the taxing power is not by these rules, or by any decision, or opinion, *exclusive.*

[11.] Nor, according to these rules, does the Ordinance conflict with the other clause of the Constitution—"No State shall, without the consent of the Congress, lay any imposts or duties upon imports or exports, except what may be absolutely necessary for executing its Inspection Laws, and the net produce of all duties and imposts laid by any State on imports or exports, shall be for the use of the Treasury of the United States —and all such Laws shall be under the control and supervision of the Congress".

1. The amount of sales is not "an import"—it is money— probably in this case bank bills; and of banks created by the State itself—a product of the State—a product certainly subject to taxation, in the hands in which it existed before it passed to these plaintiffs; and if so, it passed to them, subject to all of its incidents.    This is equally true of coin.    But that it is not an *import* is enough.

2. Nor is a tax upon the amount of sales of imports the same, *in effect,* as a tax upon imports.    The former sort of tax affects only the people of the State, which lays the tax; the latter affects them, and it may also affect the people of all other States.    A tax upon imports tends to prevent imports from passing through the State that lays the tax, into any other; and to the extent of the tendency, other States suffer.    The States might, therefore, be very well prohibited from taxing imports, without being prohibited from taxing the sale of imports.

The evil which this prohibition was intended to remedy, was this very evil of one State's taxing the imports of another, as they passed through it, to reach that other.    The Atlantic States taxed all imports.    The consequence was, that the interior States had to pay the tax upon all such articles of import as they consumed.    It was for the benefit of these interior States, that this prohibition was put in the Constitution.    The reason of the prohibition, then, does not extend to a tax upon

the consumption of imports consumed within the State itself, which imposes the tax.    (5 *Ell. Deb.* 112.)

But say that this tax on "sales" is the same thing as a tax on imports, still, the tax ordinance is not *void*.

In the view of the Constitution, a State's purpose for taxing imports or exports, may be that of executing its Inspection Laws, or it may be some other.

If the purpose be to execute its Inspection Laws, the State may ʰax imports without the consent of Congress.    And she may make the tax as high as she pleases; but she can retain of the 'produce' of the tax, only as much as is necessary to defray the expenses of the execution of the Inspection Laws. The residue she must pay to the United States.    No part of the Law, under which she imposes a tax for *this purpose*, is *void*. It is only subject to reversion and control by Congress.

But if the State's purpose be any other, she cannot tax imports and exports without the consent of Congress.    It follows, as a matter of course, that with the consent of Congress, she *may* tax them.

In the case, then, of this consent, the State Law, laying the tax, is not *void*.

Nor in this case will the produce of the tax have even to be paid to "the Treasury of the United States"; for in this case there is no such thing as "net produce".    These terms apply to the case of a tax *for executing Inspection Laws*.    It must cost something to execute such Laws.    That something is to be paid out of the tax.    The rest of the tax is "net produce."    This is to be for the use of the Treasury of the U. S.    These words, therefore, having reference to the expenses of executing Inspection laws, can have no operation, if there is no Inspection Law. This view is confirmed by the history of the clause.    See 5 *Ell. Deb.* 486, 540–7.

But even if Congress does not consent to such a Law, the Law is not void.    It is still a Law, but a Law "subject to the revision and control of the Congress."    It may be that Congress though, not consenting to such a Law, would still be satisfied with some little revision of it, so as to accommodate the

Law to its own policy—as by striking out of the Law an article which it prefers to be on the "free list"; for example, coffee. This change it could effect by a "revision" or "control" of the Law. Shall the Judiciary step in between the Congress and the State and defeat the wishes of both? It is well known that Congress has, itself, taxed imports for the *protection* of domestic manufactures, as well as for revenue. Now a tax on imports, by the States, would tend to accomplish the former object, and therefore might meet with the decided approval of Congress.

Is it to be said that Congress cannot "revise" or "control" such a Law? it is, if the doctrine be true, that such a Law is void. What is void, is not revisable—not controlable any more than what does not exist is. It is an abuse of language to speak of revising and controlling any void thing.

As, therefore, it is, " all such *Laws*" that shall be subject to the revision and control of the Congress, "such Laws" must be *Laws*, and therefore they cannot be *void*.

This seems to me to be the plain meaning of this clause of the Constitution. It is, too, a meaning entirely consistent with the most liberal rule of construing the Constitution. It is the one imperatively required by the strict rule. Taking, then, this to be the meaning, viz :

1. That a State, without the consent of Congress, may tax imports to execute her Inspection Laws.

2. That the "net produce" of such tax is to be for the use of the Treasury of the United States.

3. That with the consent of Congress, she may tax imports for any purpose.

4. That even without the consent of Congress, she may tax imports for any purpose—subject only to a power in Congress, to revise and control the tax.

5. That the part of the clause requiring the "net produce," &c. to be for the use of the United States, applies only to taxes on imports, laid for executing Inspection Laws. Let us apply it to the tax in question, in this case, assuming the tax to be in fact, a tax on imports.

[13.] 1. Is this a tax for executing the Inspection Laws of the State ? Quite a number of such Laws exist, viz : Laws for the inspection of beef, pork, pitch, tar, turpentine, fire-wood, tobacco, lumber and flour. (*Pr. Dig.* '*Staples.*') It does not appear from the facts of the case, what is the purpose of the tax. It does not, therefore, appear that so much of the tax as relates to imports, is *not* for the purpose of executing the Inspection Laws of the State. Admit that more may be said against the idea that this was the purpose than can be said in favor of it. That is not conclusive. The question is, has the State broken the Constitution in authorizing this tax ? Now it is the duty of the Courts of the State to make every presumption possible, against the idea that the State has violated the Constitution. And it is a *possible* thing for this ordinance to have been laid for the purpose of executing the State's Inspection Laws.

2. If this be such a tax, it does not appear whether there is any net produce from it or not.

[14.] 3. Supposing this not to be a tax for inspection purposes, has Congress consented to its being laid ? It is certain that Congress has not *expressly* consented. But is *express* consent necessary ? There is nothing in the Constitution which says so. There is nothing in the practice of men, or in the Municipal Law of men, or in the practice of nations, or the Law of nations that says so. Silence gives consent, is the rule of business life. A tender of bank bills is as good as one of coin, unless the bills are objected to. To stand by, in silence, and see another sell your property, binds you. These are mere instances of the use of the maxim in the Municipal Law. In the Law of Nations, it is equally potent. *Silent acquiescence* in the breach of a treaty binds a Nation. (*Vattel, ch.* 16, *sec.* 199, *book* 1. *See book* 2, *sec.* 142, *et seq.* as to usucaption and prescription, and *sec.* 208 as to ratification.

Express consent, then, not being necessary, is there any thing from which consent may be implied ? There is—length of time. The Ordinance was passed the 24th of January, 1842, and has been in operation ever since. If Congress had been opposed

to the Ordinance, it had but to speak, to be obeyed.    It spoke not—it has never spoken : therefore, it has not been opposed to the Ordinance, but has been consenting to it.

[15.] 4. Say, however, that Congress has not consented to · the Ordinance, then the most that can be maintained is, that the Ordinance stands subject to " the revision and control of Congress." It stands a *Law*—a something susceptible of revision and control—not a something unsusceptible of revision and control as a void thing would be.

5. The question, as to ' net produce', cannot arise in the case in which Congress consents, or that in which she refuses to consent to the tax.    There cannot be such a thing as ' net produce' in either of those cases ; but only in the case of a tax for inspection purposes.

[16.] But let it be granted that the ordinance is void, does it follow that the decision of the Court below ought to be reversed ? By no means.    If the Law is void, and yet is enforced, who is injured by it ?    The seller of the import ?    Not at all.    *He* is paid the tax by the purchaser from him before he pays it to the City.    The tax is ultimately paid by the *consumer* of the article.    The price or sale of which is taxed.    The merchant puts the amount of the tax, as he does every other item of the cost of the goods, in the price which he fixes upon them—and when he sells, he gets from the purchaser that amount with the rest. If the tax injures any private person at all, therefore, that person is the *consumer* of the taxed article, and not the *seller* of it.    To apply this more directly to the case.    Padelford, Fay & Co. sold imports, and got the money for them.    These imports had a tax on them.    The amount of that entered into the price at which they sold the imports.    Therefore, when they sold them at that price, they received the amount of this tax.    They have it in hand.    The City wants to get it out of their hands. They object, and insist upon keeping it, saying the Law under which it is claimed is void.    Can this objection be allowed to be in their mouth ?    The *consumer* is the injured man ; and he, by buying the taxed article and paying the tax included in the price, *waives* his objection to the tax.    *He* is willing, for his

money thus paid, to go to the City.    In fact, he pays it for the use of the City.    He might give it to the City, if he choose to do so ; and if he did and should deliver it to Padelford, Fay & Co. to deliver to the City, would they be allowed to retain it ? Certainly not.    Neither should they be allowed to retain this tax, so paid them by the consumer, for the use of the City.    It is a universal maxim, that *Quilibet potest renunciare juri pro se introducto*.    The consumer, therefore, can waive his right to object to this ordinance, on the score of its being void ; and he does this when he pays the tax it imposes on him.    It is time enough to hold a Law, made under the authority of the State, to be a violation of the Constitution, when it is complained of by somebody that it injures.    It is too soon to do this, when the complaint is made by one that it does not injure, and one, who, if the complaint be allowed, will be enabled to keep what, in justice and equity, he has no right to.

But, indeed, no private person has a right to complain, by *suit in Court*, on the ground of a breach of the Constitution. The Constitution, it is true, is a compact, but *he* is not a party to it.    The States are the parties to it.    And they may complain.    If they do, they are entitled to redress.    Or they may waive the right to complain.    If they do, the right stands waived.    Could not the States, in their sovereign capacities, or Congress (if it has the power) as their agent, forgive such a breach of the Constitution, on the part of a State, as that of imposing a tax on imports, or accept reparation for it ?    In case this were done, what would become of the claims of private persons, for damages for such breach ?    To let such claims be set up against the forgiven party, would be to do away with the forgiveness.    No, if there existed such claimants, they would have to appeal, each to his own sovereign for redress. It was that sovereign's business to get enough from the offending sovereign, to cover all private losses of his own citizens— and if he did not get enough to do that, those citizens must look to him, alone, for indemnity.

And this brings me to my general conclusion, which is, that the judgment of the Court below, ought to be affirmed.